ROBERT M. BRITTINGHAM AND JEANNE G. BRITTINGHAM, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3352–69.  Filed October 14, 1971.

*Ethan B. Stroud* and *Shirley W. Holt*, for the petitioners.
*John W. Dierker*, for the respondent.

FAY, *Judge:* The respondent determined a deficiency of $197,002.55 in the petitioners' income tax for the taxable year 1962 and an addition to tax under section 6653(a) in the amount of $9,850.13.

The issues for decision are whether a $241,000 bank deposit placed in the petitioner's bank account was gross income to the petitioners or whether the petitioners held this money only as an agent for petitioner Robert's mother, and further, if such an omission from gross income is found, whether it is a result of negligence or intentional disregard of rules and regulations so as to make the penalty provisions under section 6653(a), I.R.C. 1954,[1] applicable.

### FINDINGS OF FACT

Some of the facts are stipulated. They are found to be as stipulated, and the stipulation, together with the exhibits attached thereto, is incorporated herein by this reference.

The petitioners, Robert M. and Jeanne G. Brittingham, are husband and wife, and at the time of filing the petition herein they were residents of Dallas, Tex. Their joint Federal income tax return for the year 1962 was filed with the district director of internal revenue, Dallas, Tex. Robert M. Brittingham will sometimes hereinafter be referred to as the petitioner or Robert.

Juan R. Brittingham (sometimes hereinafter referred to as Juan) is the brother of Robert. He is a citizen of Mexico who resides in Monterrey, Mex.

Roberta M. Brittingham (sometimes hereinafter referred to as Roberta) is the mother of the petitioner and Juan. She is a citizen of Mexico and has resided in Monterrey since prior to 1962. Roberta is an 80-year-old woman who had been ill and mostly bedridden for several years prior to and including 1962.

Roberta is a woman of substantial means. From 1956 to 1962, inclusive, she received dividends from a family-owned corporation, Ceramica Regiomontana, S.A., of at least $200,075.70. Roberta had other business interests which gave her a return on her investments of at least $224,081.96 during the years 1955 to 1962, inclusive.

Roberta's husband passed away in 1945 and for all times thereafter, Juan and Robert acted as representatives of Roberta for financial affairs. From 1947 on, Juan acted in such capacity pursuant to a power of attorney. During the fall of 1962 Juan decided to diversify his mother's holdings and subsequently requested Robert to check with Republic National Bank of Dallas to see which United States bonds should be purchased for their mother's account.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

On December 10, 1962, Juan caused certain Mexican bonds, issued by the Compania General Acceptaciones, S.A., and belonging to Roberta, to be sold and the proceeds thereof in the amount of $223,444.68 to be deposited in his account at Bank of Nuevo Leon in Monterrey, Mexico. On the same date Juan withdrew these funds belonging to his mother and $17,555.32 of his own funds from his account at the Bank of Nuevo Leon.

The total funds withdrawn, $241,000, were then used to purchase a cashier's check in the same amount which was sent to Robert in Dallas, Tex. Robert received this $241,000 in December 1962, together with instructions to use the money for the purchase of United States bonds for his mother, Roberta.

The $241,000 cashier's check received by petitioner was made payable to his name and was deposited in his own bank account at the Republic National Bank of Dallas. Petitioner immediately gave instructions to Republic National Bank to purchase $241,000 worth of State and municipal bonds for the account of his mother and to charge the purchases against his account in which the $241,000 check had been deposited.

The Republic National Bank, on January 9 to January 28, 1963, purchased certain United States municipal bonds in the amount of $237,782.79 for Roberta, petitioner's mother, and charged the petitioner's account with the purchase. The Republic National Bank made a clerical error and showed the purchase order of the bonds to be in the name of Robert M. Brittingham rather than Roberta M. Brittingham. However, as soon as Robert discovered this clerical error he immediately called the bank and had the error corrected. Corrected purchase invoices, in the correct and proper name of Mrs. Roberta M. Brittingham, were issued in January 1963.

On January 25, 1963, Roberta borrowed $465,120 from the Republic National Bank and the proceeds were used to purchase 6,120 shares of stock owned by Jack Jenkins in Dallas Ceramic Co. After this purchase, the Brittingham family was the sole shareholder of Dallas Ceramic Co. On February 1, 1963, the said Dallas Ceramic Co. stock was then issued to Roberta's grandchildren, as follows:

| *Robert M. Brittingham's children* | *Shares* |
|---|---|
| Robert G. Brittingham | 1,530 |
| John G. Brittingham | 1,530 |
| Total | 3,060 |
| *Juan R. Brittingham's children* | |
| Barbara [Brittingham] de Marroquin | 1,020 |
| Cristina [Brittingham] de Lobeira | 1,020 |
| Roberta Brittingham | 1,020 |
| Total | 3,060 |

On January 25, 1963, the same date the loan was secured, the stock purchased from Jack Jenkins was pledged as collateral for the loan. At that time the petitioner agreed to repurchase the stock for $465,120 if the loan was defaulted, thereby, in effect guaranteeing Roberta's loan.

On February 18, 1963, 5,760 shares of Dallas Ceramic Co. stock which had been issued to Juan and his wife were substituted as collateral for the previously pledged 6,120 shares. Robert continued his pledge to purchase the stock offered as collateral if the loan was defaulted.

The $237,782.79 of municipal bonds which were issued in Roberta's name were sold on March 28, 1963, for $238,220.12 and the proceeds were deposited in the Republic National Bank account of Mrs. Roberta M. Brittingham.

On the same day, March 28, 1963, the proceeds of the bond sale were applied as partial repayment of the $465,120 loan which Roberta had made to purchase the Dallas Ceramic Co. stock from Jack Jenkins.

From August 15, 1963, to January 24, 1964, a total of $150,512.87 from the joint bank account of Juan R. Brittingham or Angel Marroquin, Juan's son-in-law, was used to repay a portion of Roberta's loan. There is no testimony presented as to who paid the balance of this original $465,120 loan.

On their Federal income tax return for the calendar year 1962, petitioners reported an amount of gross income of approximately $164,000. In his notice of deficiency, the Commissioner included, under the provisions of section 61 an additional amount of gross income of $241,000 for the taxable year in question. The Commissioner also determined that the underpayment of tax was due to negligence or intentional disregard of rules and regulations. Consequently, the 5-percent addition to the tax provided by section 6653(a) was asserted for that year.

OPINION

In limine a question to be answered concerns the admissibility of certain letters alleged to be within the attorney-client privilege. We admit into evidence six of the letters from this series of letters dealing with Roberta's income and net worth for the years 1955 through 1963. The seventh letter is within the attorney-client privilege and is not admissible. Though this evidence forces the Court to be rather skeptical toward both the petitioner's and his brother's testimony as to Roberta's income, the admitted evidence is not at all conclusive. In substance the letters convey the idea that Roberta had a rather modest net worth and a not substantial sum of income during the years in question.

The testimony discloses that in 1956 the California State Franchise Tax Board advised Roberta that she should have filed a California State income tax return for 1954. Roberta's son, Juan, asked a Los Angeles bank to recommend an attorney to handle this matter for his mother, and the bank recommended Samuel Rindge. Juan gave Rindge's name to Roberta, and she then personally retained Rindge to represent her in the matter. He prepared a return for the calendar year 1954 which she signed and filed with the State tax authorities. Her liability for that year was closed on the basis of the return as filed.

In a subsequent year, Roberta again called Rindge and informed him that the California State Franchise Tax Board had called her and asked her why she had not filed returns for 1955 through 1963, and she retained him to handle this new matter for her. In the course of negotiations with the State tax authorities, Roberta's sons, Juan and Robert, wrote Rindge several letters containing information relating to her financial affairs, he replied to those letters, prepared California State returns for her, and made certain computations and notes. The letters from Juan and Robert, as well as one from Roberta, and copies of the papers prepared by Rindge were kept in a file maintained in his office.

On several occasions during the period in which Rindge was working on this matter, Roberta talked with him by telephone with reference to her tax problems. Upon completion of the work in 1965, Rindge submitted a bill for his services. It was paid by a check given on an account of Dallas Ceramic Co., a corporation in which Roberta was once a shareholder, and she subsequently reimbursed the corporation for the payment.

On January 27, 1969, two agents of the Internal Revenue Service, who were engaged in the investigation of the tax liabilities of Juan and Robert, called on Rindge and requested information on the check which he had received in payment of the fee for services rendered to Roberta. In response to the agents' inquiries, Rindge informed them of the nature of the services which he had performed, and the agents asked Rindge if they might see the files pertaining to the check. After examining the files, he made certain papers available to the agents and, at their request, gave them copies of such papers.

Roberta, through her attorney, strongly objects to the introduction of these papers in the case before us. She asserts: (1) That all the communications were made by her either directly or through her agents; (2) that all the communications were made to her attorney in confidence and are protected by the time-honored privilege which governs confidential communications between client and attorney; and, finally, (3) that this privilege may be claimed by her even though she is not before the Court in this present case.

We are in complete agreement with Roberta's first and third assertions. However, as to six of the seven letters, we disagree with the contention that these communications were made in confidence. These communications were made to Rindge for the sole purpose of passing them on to the California State taxing authorities. Such communications are not made in confidence and are not within the privilege.

The essentials of the general principle of the attorney-client privilege as found in 8 Wigmore, Evidence, sec. 2292, p. 554 (McNaughton rev. 1961) are:

(1) *Where legal advice of any kind is sought* (2) *from a professional legal adviser in his capacity as such,* (3) *the communications relating to that purpose,* (4) *made in confidence* (5) *by the client,* (6) *are at his instance permanently protected* (7) *from disclosure by himself or by the legal adviser* (8) *except the protection be waived.*[1] [Footnote omitted.]

Juan and Robert were both agents for Roberta in matters concerning her financial affairs. Roberta is an elderly infirm woman. Juan and Robert both had special knowledge of their mother's financial affairs and sources of income. Juan had been handling all of his mother's business and financial affairs under a power of attorney since 1947. The communications to Rindge were made on Roberta's behalf by her sons in their capacity as agents. The information disclosed to Rindge was solely in regard to Roberta's financial status and possible tax liability. This information is considered a communication from Roberta for purposes of the attorney-client privilege.[2]

In upholding the petitioner's third point, that Roberta could assert

---

[2] In further defining communications made by the client, the following provisions of Wigmore are most critical:

"5. 'By the Client'

"§ 2317. Knowledge acquired by the attorney from persons other than the client: (1) From the client's agent; (2) From other persons.

"1. *Communications from the client's agent.* The client's freedom of communication requires a liberty of employing other means than his own personal action. The privilege of confidence would be a vain one unless its exercise could be thus delegated. A communication, then, by *any form of agency* employed or set in motion by the client is within the privilege.[1]

"This of course includes communications through an *interpreter,*[2] and also communications *through a messenger* or any other *agent of transmission,*[3] as well as communications *originating with the client's agent* and made to the attorney.[4] * * *"

(Footnotes omitted. 8 Wigmore, Evidence, sec. 2317, pp. 618–619 (McNaughton, rev. 1961).)

For what are "communications *originating with the client's agent* and made to the attorney" see:

"Fire Assn. v. Flemming, 78 Ga. 733, 3 S.E. 420 (1887) (client's agent's correspondence protected) ; Maas v. Bloch, 7 Ind. 202 (1855) (client's agent's conversation with the attorney, held privileged) ; Bingham v. Walk, 128 Ind. 164, 27 N.E. 483 (1891) (husband as the agent of the wife to consult; privilege recognized) ; * * * Scales v. Kelley, 70 Tenn. (2 Lea) 706 (1879) (communications by the client's wife and daughter seeking to engage counsel for the client, held privileged)."

the privilege at petitioner's trial though she is not before the Court, we are directed once again to Wigmore, Evidence, sec. 2321, at 629.[3] However, the petitioner's attempt to suppress this evidence must fail in light of the fact that the statements made in the letters in question were never intended to be confidential. The essence of the attorney-client privilege is that it is limited to communications intended by the client to be confidential.[4]

The question of confidentiality is one of the particular facts and circumstances of each individual case. A great deal of information transmitted to an attorney by a client is not intended to be confidential, but rather is given for transmittal by the attorney to others. See *Harris* v. *United States*, 413 F.2d 316 (C.A. 9, 1969); *Colton* v. *United States*, 306 F.2d 633 (C.A. 2, 1962); *United States* v. *Tellier*, 255 F.2d 441 (C.A. 2, 1958); *Wilcoxon* v. *United States*, 231 F.2d 384 (C.A. 10, 1956), certiorari denied 351 U.S. 943 (1956); and *Olender* v. *United States*, 210 F.2d 795 (C.A. 9, 1954).

In the *Tellier* case the court had before it a fraudulent securities action rather than a tax case. Tellier, the defendant, had a detailed telephone conversation with his attorney. In this conversation Tellier was warned that certain practices if followed would lead to serious penalties. The attorney then incorporated the substance of the conversation into a letter which was to be forwarded to Tellier's business associates. The court in *Tellier* held that the communications between the attorney

---

[3]      "6. 'Are at His Instance Permanently Protected'

"§ 2321. Privilege is the client's, not the attorney's nor the party's; * * *

"But it is as client, *not as party to the cause,* [emphasis theirs] that he is entitled; for the reason of the privilege applies to all clients as such, whether or not they are parties when the disclosure is sought from them. Hence, *the privilege equally forbids disclosure by the attorney of a client not in any way concerned in the cause.*[2] * * *" (Emphasis ours.)

For cases supporting this proposition, see *Baldwin* v. *Commissioner,* 125 F.2d 812 (C.A. 9, 1942), reversing on other grounds 43 B.T.A. 183 (1940). See also:

"People v. Horowitz, 70 Cal. App. 2d 675, 161 P.2d 833 (1945) (attorney of one not a party not admissible as to the client's communications); * * * Bacon v. Frisbie, 80 N.Y. 394, 400 (1880) (nor, when the client objects, can the communication be disclosed * * *).

"ENGLAND: Wilson v. Rastall, 4 Term R. 753, 760 (1792) * * * R. v. Withers, 2 Camp. N.P. 578 (1811) (Ellenborough, C.J.; communications by a third person privileged 'although he be not in any shape before the court')."

Wigmore, *supra* at sec. 2321, fn. 2, at 269.

[4]      "4. 'Made in Confidence'

"§ 2311. Communications must be confidential; * * * The privilege assumes, of course, that the communications are made with the intention of confidentiality. The reason for prohibiting disclosure * * * ceases when the client does not appear to have been desirous of secrecy. 'The moment confidence ceases,' said Lord Eldon, 'privilege ceases.'[1] This much is universally conceded.[2]

*      *      *      *      *      *      *

"But the mere relation of attorney and client does not raise a presumption of confidentiality,[4] and *the circumstances are to indicate whether by implication the communication was of a sort intended to be confidential.* These circumstances will of course vary in individual cases, and the ruling must therefore depend much on the case in hand.[5]"

(Emphasis supplied. Footnotes omitted. Wigmore, *supra* at 599–600.)

and his client were not privileged if it was understood that the information communicated was to be conveyed to others. It was held that the preparation of the letter was evidence that the substance of the telephone conversation was to be communicated to third parties.

While the *Tellier* case did not encompass the tax field, or communications from the client to the attorney, this gap has been filled by *Colton* v. *United States, supra. Colton*, relying on *Tellier*, states at page 638:

Not all communications between an attorney and his client are privileged. Particularly in the case of an attorney preparing a tax return * * * a good deal of information transmitted to an attorney by a client is not intended to be confidential, but rather is given for transmittal by the attorney to others—for example, for inclusion in the tax return. Such information is, of course, not privileged. * * *

A thorough examination of the letters herein, and the circumstances surrounding the communications, convinces us that six of the letters are the type of communications which were intended to be transmitted to third parties and which, according to both *Tellier* and *Colton*, were not confidential.

The first series of letters dated July 6, 13, and 14, 1965, includes a letter from Rindge to Robert. Rindge in his letter refers to an inquiry he received from the Franchise Tax Board of California regarding Roberta's income. Rindge in turn asks for Robert's answers to the tax board's questions. The second letter is from Robert to Rindge supplying these answers, and finally we see Rindge's letter which passes Robert's answers on to the board.

The second series of letters dated June 21, 23, and 24, 1965, is similar in nature, except here Roberta's agents, Juan and Robert, not only inform Rindge as to Roberta's income for the years in question, but they also include statements about her rather limited net worth. While we are aware that statements as to net worth would not be passed on by Rindge in a tax return, close scrutiny of the letters reveals that some of the statements were made as direct answers to the Franchise Board's questions. All these statements were intended to be passed on to the board to inform the board that it had the wrong Roberta Brittingham because the petitioner's mother, Roberta M. Brittingham, was a woman of only limited means.

The Franchise Board's inquiry states: "Information available to this office indicates that Mrs. Brittingham had community property of several million dollars while her husband was living."

Robert's letter to Rindge, part of which was incorporated into Rindge's answer to the Franchise Board, states:

At the time of my father's death in 1945, my mother was left an estate of probably less than $25,000 plus a life insurance policy that paid her approxi-

mately $30,000. This is all she had at the time of my father's death so you can see that the information available to the Franchise Tax Board is incorrect.

The essence of these communications convinces us that Rindge served only as a "relay man" through which Robert and the Franchise Tax Board exchanged information. It is clear that the petitioner and his brother passed information on to Rindge with the full intention of having Rindge pass this same information to a third party. The sole purpose of the statements in the letters was to explain fully the income and net worth position of Roberta M. Brittingham in hope that the Franchise Board would accept these statements at face value and not pursue the tax liability of Roberta. There is no privilege as to these documents.[5]

The remaining questions involved in this case are purely factual. The only substantive issue to be decided is whether a $241,000 bank deposit placed in petitioner's bank account was gross income to the petitioner, or whether the petitioner held this money only as an agent for his mother.

The respondent's case rests on two related premises. First, the petitioner could not have been a mere conduit for his mother's funds, for previous statements made by the petitioner and his brother show that Roberta never possessed the amount of the funds in question. Second, that in substance the effect of all of the events surrounding this deposit in the petitioner's account is to funnel, tax free, $241,000 in income to the petitioner while using his mother and his children as a smokescreen.

A review of all the events, which begin with Juan's withdrawal of funds from his bank account on December 10, 1962, and end with the January 24, 1964, final payment on Roberta's $465,120 loan, reveals the following:

(1) All of the outstanding stock of Dallas Ceramic Co. not owned by the Brittingham family was purchased and transferred one-half to Robert's children and one-half to Juan's children.

(2) Approximately one-half of the cost of this stock purchase was absorbed by Roberta as a result of her using proceeds from the sale of

---

[5] There is a seventh letter dated Mar. 15, 1965, which is not admissible. This letter was written by Juan to Rindge and its purpose was to inform Rindge of all the necessary details Rindge might need to determine what must be inserted in Roberta's income tax returns. Here, the petitioner was relying on Rindge's professional expertise to determine what should be passed on to the California authorities. The purpose of the attorney-client privilege is to foster this kind of disclosure.

"Information communicated by the client with the direction * * * that it be, or not be, so inserted in the discretion and judgment of respondent [the attorney] need not be divulged unless respondent [the attorney] has heretofore voluntarily divulged the contents of the communication to an Internal Revenue agent in the course of respondent's [the attorney's] representation of the client. * * *" [*United States* v. *Threlkeld*, 241 F.Supp. 324, 326 (W.D. Tenn. 1965)]

bonds to repay the loan which financed the stock purchase. One-fourth of the cost of the stock purchase was paid out of funds from a joint bank account in the name of Juan Brittingham or Angel Marroquin, and the bearer of the other one-fourth of the cost of the stock purchase is unknown.

(3) The net effect was for Roberta to give petitioner's children a gift of very valuable stock, while she gave nothing to Juan's children.

Respondent contends that the $241,000 which at one point found its way into the petitioner's bank account was actually gross income to the petitioner.

It is well settled that an unexplained bank deposit is properly includable in income in accordance with section 61.[6] See *Emanuel Hollman*, 38 T.C. 251, 261 (1962); *O'Dwyer* v. *Commissioner*, 266 F. 2d 575 (C.A. 4, 1959), affirming 28 T.C. 698 (1957), certiorari denied 361 U.S. 862 (1959); *Hoefle* v. *Commisioner*, 114 F. 2d 713 (C.A. 6, 1940), affirming a Memorandum Opinion of the Board of Tax Appeals.

It is also well established that the respondent's determination that an unidentified deposit constitutes income is prima facie correct and the burden of proof is upon the taxpayer to overcome this presumption. *Hoefle* v. *Commisioner, supra; O'Dwyer* v. *Commissioner, supra.*

The petitioner has adequately met his burden. The bank deposit in question has been properly accounted for. The petitioner's testimony and that of his witnesses is sufficient to overcome the presumption of correctness of respondent's determination. Robert did not receive taxable income in the amount of $241,000 in 1962. The sum forwarded to the petitioner in December of that year belonged to Roberta. These payments were made to the petitioner in his capacity as agent and custodian. The petitioner was obligated to expend them for his mother's use and any diversion for his own purposes would be a breach of

---

[6] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;
(2) Gross income derived from business;
(3) Gains derived from dealings in property;
(4) Interest;
(5) Rents;
(6) Royalties;
(7) Dividends;
(8) Alimony and separate maintenance payments;
(9) Annuities;
(10) Income from life insurance and endowment contracts;
(11) Pensions;
(12) Income from discharge of indebtedness;
(13) Distributive share of partnership gross income;
(14) Income in respect of a decedent; and
(15) Income from an interest in an estate or trust.

this relationship. The essence of taxable income, as the concept is used in section 61, is the accrual of some gain or benefit to the taxpayer; mere dominion over money is not the decisive factor. See *Commissioner v. Wilcox*, 327 U.S. 404 (1946) ; *Seven-Up Co.*, 14 T.C. 965 (1950).

The evidence herein offered by the petitioner establishes Roberta as a woman of substantial wealth. While the petitioner has offered many creditable witnesses to testify as to Roberta's wealth, the most compelling testimony is in the form of bank deposit slips and other items showing that Roberta received well over $400,000 in income and return of principal for the years 1955 through 1962.

Since 1947 petitioner and principally his brother, Juan, have been handling their mother's financial affairs. In light of this, it is not unusual to assume that the purchase of the bonds was another act by the petitioner in his capacity as agent.

The bonds which were purchased with the money in question were originally merely issued to Robert instead of to Roberta. This was a clerical error which is not at all hard to understand. The bank had made similar errors in the past. As soon as the petitioner realized the mistake he was quick to correct it. There is more than adequate testimony from unrelated bank employees as to these facts.

The petitioner is the chief executive officer of Dallas Ceramic Co., a profitable tile business in Dallas. He is accustomed to being audited regularly by the Internal Revenue Service. To be sure, if he were trying to secretly channel a large sum of foreign income to himself he would find a more discreet way of doing so than to openly deposit $241,000 into his own bank account.

In order to rebut the record supporting the petitioner's contention, it is incumbent on the respondent to do more than just show that on other occasions regarding tax liability the petitioner and his brother were not adverse to concealing the true facts. Respondent has failed to show that the petitioner has indulged in such a deviation from the truth in the case before us. While a situation in which a wealthy grandmother purportedly bestows her largess on only one set of grandchildren may be suspect when there are additional grandchildren, this is only one fact among many to be weighed.

The petitioner has tipped the scales in his favor, and we hold that as to the $241,000 in question the true facts show his connection with these funds was that of an agent.

As a result of our holding that this $241,000 item was not income to the petitioner, we do not reach the question of whether its omission as an item of gross income was a result of negligence or intentional disregard of rules of regulations.

*Decision will be entered for the petitioners.*