CLAIRE A. RYZA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent WOODROW W. LASHLEY, SR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ryza v. Commissioner
Docket Nos. 8528-72, 8529-72.
United States Tax Court
T.C. Memo 1977-64; 1977 Tax Ct. Memo LEXIS 376; 36 T.C.M. (CCH) 269; T.C.M. (RIA) 770064; March 14, 1977, Filed *376 Held: 1. Petitioners were equal partners, and each, therefore, should be taxed for half of their partnership income. 2. Respondent failed to make proper allowance for certain non-income items in determining petitioners' income tax liability under the bank deposits method; accordingly, petitioners should receive additional credit for non-income items. 3. Petitioners are entitled to deduct certain ordinary and necessary business expenses. 4. Petitioners are entitled to an ordinary loss arising from the sale of real property used in their trade or business. 5. Petitioner Woodrow W. Lashley, Sr., has failed to establish his income for 1963, and petitioner Claire A. Ryza has failed to establish her income for 1961 and 1963. Since petitioners must establish their base period incomes for the purpose of income averaging and since 1961 and 1963 constitute base period years for petitioners, they may not average their income. Arnold M. Weiner and David L. Snyder, for the petitioners. Howard L. Williams, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies [1] in Claire A. Ryza's income taxes: Year
Deficiency
Addition to Tax Under Sec. 6653(b)[2]
1964
$13,722.45
$ 6,861.23
1965 56,433.65
28,216.82
1966
50,238.74
25,119.37
Respondent *377 determined the following deficiencies[3] in Woodrow W. Lashley, Sr.'s income taxes: Addition to Tax Year
Deficiency
Under Sec. 6653(b)
1965
$55,621.03
$27,810.52
1966
53,221.91
26,610.96
Petitioners have conceded that they are liable for the additions to tax under section 6653(b). Therefore, the remaining issues are: (1) Whether petitioners *378 engaged in a partnership for tax purposes; (2) whether respondent, in his application of the bank deposits method, included in petitioners' income certain deposits which were not income items; (3) whether petitioners may take deductions for expenses allegedly incurred in their incomeproducing activities; (4) whether petitioners are entitled to an ordinary loss, pursuant to section 1231, sustained on the sale of real property; and (5) whether petitioners may average their income. GENERAL FINDINGS OF FACT Some facts were stipulated and are found accordingly. Petitioner Claire A. Ryza (hereinafter Ryza) and petitioner Woodrow W. Lashley, Sr. (hereinafter Lashley), lived in Port Tobacco, Maryland, when they filed their petitions herein. Ryza filed timely income tax returns for 1964, 1965, and 1966 with the District Director, Internal Revenue Service, Baltimore, Maryland. Lashley filed timely income tax returns for 1965 and 1966 with the District Director, Internal Revenue Service, Baltimore, Maryland.
Issue 1. Agreement Between Petitioners Concerning Their Income. FINDINGS OF FACT Lashley was born in North Carolina in 1918. He moved to the Washington, D.C. area in 1936 and married *379 Madeline Lashley. Thereafter he began performing illegal abortions. In 1958, Lashley, his wife, and his brother-in-law, Robert Jordan, were convicted in Fairfax, Virginia, of performing abortions. Lashley was sentenced to a three-year prison term. In August or September of 1961, when Lashley was released from prison, he separated from his wife. Although he tried to get a divorce, he was unable to do so and remains legally married to her. Since their separation, Madeline Lashley has been hostile towards Lashley.At various times, she has instituted legal actions against him. Ryza was born in New York City. She lived in that area until 1961. She married twice; both marriages ended in divorce, the first in 1947 and the second in 1951. From her second divorce until 1961, Ryza lived with her son and mother. Petitioners first met in 1961 in Washington, D.C. Shortly thereafter they began living together as though they were man and wife. They have lived together in this relationship until the time of trial. Each established a close family relationship with the relatives of the other. For a substantial time, including the years in question, they have been regarded as husband and *380 wife by the members of their respective families. Ryza frequently visited relatives of Lashley and those relatives, in turn, visited petitioners at their home. Janet Moschella, Lashley's sister, considers Ryza to be her sister-in-law. Throughout the years in question, Ryza corresponded with Lashley's mother. In her letters to Ryza, the elder Mrs. Lashley referred to petitioner as her "daughter" and to herself as "Mother Lashley." Around 1962, petitioners moved from Washington, D.C. to Charles County, Maryland. At that time Lashley, in partnership with his son, Woodrow W. Lashley, Jr. (sometimes hereinafter Lashley, Jr.), went into the business of buying, repairing, and selling Volkswagen automobiles. Ryza was also active in this family business. They traded under the name of L & L Enterprises (sometimes hereinafter L & L). The business was conducted in a building in Waldorf, Maryland, which was leased to petitioners. Around 1963, the automobile business was incorporated under the name of L & L Enterprises, Inc. The half interest belonging to Lashley was put in the name of Ryza. Consequently, the stock in the corporation was issued equally to Ryza and Lashley, Jr. Both petitioners, *381 together with Lashley, Jr., continued to manage and conduct the business. Both petitioners were paid salaries by the corporation. Various other persons were hired to work for L & L Enterprises, Inc. As of 1964, L & L Enterprises, Inc., became a Datsun agency. In 1963, a checking account was opened at The Waldorf Bank, Waldorf, Maryland, in the name of Claire A. Ryza. This account was maintained during the years in question. Although Ryza was the only signatory, both petitioners used this account as a personal checking account. Both petitioners deposited their salary checks in this account and paid many of their living expenses from it. For example, disbursements were made from this account for Lashley's charitable contributions, driver's license, and medical bills. Ryza frequently issued other checks on this account to Lashley and, at his direction, to Lashley's destitute brother, his mother, sister, daughter, and daughter-in-law. Petitioners regarded the money in this account as belonging to both of them. In 1963, when they were about to acquire some real estate, petitioners consulted their attorney, Edward S. Digges of La Plata, Maryland. Mr. Digges had represented them *382 previously in connection with the automobile business, and he was then defending Lashley against a claim by Madeline Lashley. Petitioners told Mr. Digges that they were both purchasing the property, and they inquired whether the deed should be taken in both of their names. Mr. Digges advised them that the property should be taken in Ryza's name alone. He explained that Maryland law recognized a wife's dower interest and that should Lashley's interest appear on the deed his estranged wife would be required to execute any conveyance of the property.
On Mr. Digges' advice, the property was taken in Ryza's name alone. This property was a building lot in Port Tobacco, Maryland, on which the petitioners later constructed their home. Petitioners purchased another parcel of land in 1963 and other parcels in later years; these parcels were taken solely in Ryza's name. By the spring of 1964, Lashley was again performing illegal abortions. At his request, Ryza worked with him, dividing the labors and sharing the profits. They were equal partners, and because of their "husband and wife relationship," the proceeds were shared equally.Lashley acted as a doctor, and Ryza as a nurse. When petitioners *383 began performing abortions together in 1964, they worked only occasionally and without a permanent location. In March of 1965, after petitioners were performing abortions more regularly, they purchased a house in Lutherville, Maryland, in Ryza's name, for use as an abortion clinic. This house was sold in August of 1966. In November of 1966, petitioners began performing abortions in a house which they had leased in Howard County, Maryland. Both petitioners signed the lease, using assumed names. Petitioners performed abortions at this location until the premises were raided, and they were arrested, in November of 1967. Police surveillance, conducted two weeks before the raid, showed petitioners arriving and departing together. Petitioners were arrested, tried, convicted, and sentenced together. Payments for abortions were always in cash. Petitioners agreed to open a checking account to deposit the abortion proceeds and to use this account for conducting a construction business. Therefore, in July of 1964, petitioners opened an r/yza Builders." Each petitioner had equal rights in this account. Petitioners were together when they opened this account and made the initial deposit. *384 Most of the cash from performing abortions was deposited in the Maryland National Bank account. Both petitioners made deposits in this account. Sometimes they made the deposits together, sometimes separately. Funds in this account belonged to both petitioners. Petitioners used the Maryland National Bank account to acquire property and to construct improvements thereon. Petitioners jointly decided which property to purchase and what improvements to make thereon. Petitioners entitled their business venture "C. A. Ryza Builders" because of Lashley's marital problems, the same reason for titling various deeds in Ryza's name. Lashley managed the construction work, and Ryza did the bookkeeping. Before their credit was established, Lashley carried checks to issue to suppliers when he bought supplies. Later, after credit had been extended, Ryza, who maintained the checkbook, issued most of the checks to pay the monthly bills.Lashley purchased all of the materials and directed all of the construction. He employed carpenters and laborers.He dealt with all of the suppliers and subcontractors, and he supervised the subcontractors as they performed their work. Throughout 1964, 1965, *385 and 1966, petitioners orally agreed to associate together as equal partners in their income-producing enterprises. Both petitioners rendered valuable services in all of their enterprises. Petitioners mutually controlled their income-producing activities, and each acted at various times as a principal in dealing with employees and other parties. Throughout the years in question, petitioners regarded all of the income from their enterprises--including L & L Enterprises, their abortion mill, and the building company--as having been equally earned. Petitioners agreed and understood that the two checking accounts, regardless of the names in which they were held, belonged to them equally. Any unreported income in either of these checking accounts was earned equally by petitioners, and the funds belonged to both of them. Petitioners agreed and understood that all of the real estate purchased during the years in question, even though held solely in Ryza's name, was owned equally. Because of Lashley's marital problem, petitioners decided that the real estate would remain in Ryza's name for her lifetime, that the real estate would then pass to Lashley for his lifetime, and that the remainder *386 would be divided among petitioners' children. Ryza agreed to execute a will to reflect their agreement as to the ownership of the real property. In early 1966, petitioners consulted their attorney, Mr. Digges, and requested him to prepare a will for Ryza. They told Mr. Digges that all of their assets, regardless of how titled, were owned jointly. The will was prepared, and it was executed by Ryza in March of 1966. The will reflected petitioners' agreement. ULTIMATE FINDINGS OF FACT Petitioners were equal partners in all of their business ventures during each of the taxable years in question. Funds deposited in the bank accounts described above belong to each of the two petitioners as equal partners. OPINION The first issue is whether petitioners engaged in a partnership for tax purposes. Petitioners contend that they did engage in a partnership and that any unreported income earned during the years in question should be attributed to them equally. Respondent contends that petitioners did not engage in a partnership and that all unreported income should be attributed to petitioner Ryza. A partnership includes a syndicate, group, pool, joint venture, or other unincorporated *387 organization through or by means of which any business, financial operation, or venture is carried on. Secs. 761(a) and 7701(a)(2). "The term 'partnership' is broader in scope than the common law meaning of partnership, and may include groups not commonly called partnerships." Sec. 1.761-1(a), Income Tax Regs. A partnership agreement may be "oral or written." Sec. 1.761-1(c), Income Tax Regs. Whether petitioners engaged in a partnership within the meaning of section 761(a) and section 7701(a)(2) and the regulations promulgated thereunder is a question of fact to be determined from all of the existing circumstances. Herbert M. Luna,42 T.C. 1067, 1077-1078 (1964). Commissioner v. Culbertson,337 U.S. 733, 742 (1949), states most succinctly the tests to be applied in determining the existence of a partnership. The question is not whether the service or capital contributed by a partner are of sufficient importance to meet some objective standard * * * but whether, considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and *388 capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. Assuming that there is a partnership, a partner's distributive share of income is determined by the agreement between the partners. Sec. 704(a). A partner is taxable only for his or her distributive share "irrespective of whether that share is actually distributed." United States v. Basye,410 U.S. 441, 447-448 (1973). After considering the facts of this case, we are convinced that petitioners engaged in a partnership. Any unreported income earned during the years in question should be attributed to them equally. First, under both direct examination and intense cross-examination, petitioners repeatedly testified that they intended to share the income "as business partners," "50-50," "half and half," "like man and wife." Second, petitioners operated various businesses and their abortion mill together. In the case of C. A. Ryza Builders, for example, Lashley managed the construction work, and Ryza did the bookkeeping. *389 And in the case of the abortion mill, from which much of petitioners' unreported income was apparently derived, Lashley acted as a doctor and Ryza as a nurse. Since Lashley enlisted Ryza's help in performing abortions rather than Ryza enlisting Lashley's help, it would be anomalous to hold, as respondent requests, that all of the unreported income is attributable to Ryza. Furthermore, in the case of both the abortion mill and L & L Enterprises, petitioners obligated themselves together on leases. Third, both petitioners exercised control over the proceeds of their enterprises and derived benefits therefrom. The Maryland National Bank account, for example, in which most of the abortion proceeds were deposited, was opened by both petitioners; both petitioners made deposits in it and both had the right of complete withdrawal. Fourth, petitioners declared to their attorney that all of their assets were jointly owned.Their declaration is clearly borne out by their handling of the Waldorf Bank account. Although this account was in Ryza's name, both petitioners used it as a personal checking account. Both of their paychecks from the automobile business were deposited there, and both *390 of their living expenses were paid from it, including disbursements for Lashley's charitable contributions, driver's license, and medical bills. Fifth, petitioners used the proceeds of their enterprises to purchase a homesite and to build a home which they occupied as though they were man and wife. Sixth, Lashley had a good reason for putting real property (which he considered jointly owned by Ryza and himself) in Ryza's name alone. Edward S. Digges, petitioners' attorney, advised petitioners to put any real property that they purchased in Ryza's name alone. He explained that since Lashley was still married to Madeline Lashley, she would be required to execute any conveyance of property (since at the time Maryland law recognized a wife's dower interest). Seventh, the true understanding between petitioners was indicated in a will executed by Ryza. Under that will, upon her death, Lashley would have a life interest in the real property that they felt they jointly owned. Upon his death, the property would pass to petitioners' children. In light of this evidence, we necessarily hold, as stated above, that petitioners engaged in a partnership. It is clear that one-half of the unreported *391 income should be attributed to each petitioner. Issue 2. Credit For Nontaxable Bank Deposits. FINDINGS OF FACT Respondent used the bank deposits method to determine petitioners' income. Petitioners maintained the L & L Enterprises checking account at the Potomac Bank and Trust Company in Fairfax, Virginia, some distance from the L & L premises. In the day-to-day operation of its business, L & L would have substantial receipts. To transmit funds to the L & L account in Virginia, petitioners would deposit these receipts in the account at The Waldorf Bank, in Waldorf, Maryland.Ryza would then issue a check on the Waldorf Bank account payable to L & L and send it to the Virginia bank for deposit in L & L's account. Some of the deposits in the Waldorf Bank account were too small to draw a corresponding check immediately to the order of L & L Enterprises. Therefore Ryza would wait until the deposits in the Waldorf Bank account amounted to a fairly substantial figure before writing a check to L & L Enterprises and depositing it in the Virginia account. Janet Moschella, Lashley's sister, sometimes ordered furniture when she visited petitioners in Maryland. Since the furniture company *392 required payment before shipping furniture to Mrs. Moschella's home in New Jersey, Ryza would advance Mrs. Moschella funds through checks drawn on the Waldorf Bank account. Mrs. Moschella would promptly reimburse petitioners, and the reimbursements would be deposited in either the Waldorf Bank account or the Maryland National Bank account. During 1965, Ryza drew checks totaling $1,331.76 on the Waldorf Bank account payable to the furniture company. Two of the checks and the stub for a third indicate that they were for Mrs. Moschella's benefit. Mrs. Moschella drew one check, payable to Ryza, in the amount of $621. This check was deposited in the Waldorf Bank account on April 17, 1965. Mrs. Moschella issued another check to Ryza in the amount of $345. This check was deposited in the Maryland National Bank account.
Robert Jordan was Lashley's brother-in-law and an employee of L & L Enterprises. In October of 1964, when Mr. Jordan was building a home for himself, petitioners loaned him $1,000 and also advanced $1,091.67 to his suppliers. The loan and these advances were all made through checks drawn on the Maryland National Bank account. Suppliers' records confirm the purpose for *393 the advances as do the stubs for the checks to the suppliers. Robert Jordan repaid the loan and the advances promptly. Petitioners deposited the repayments in the accounts from which the sums had been withdrawn. Thomas Goodman and William Smythers were two mechanics employed by L & L Enterprises. They had no checking accounts of their own. They requested Ryza to issue checks on their behalf to pay their bills. Ryza would cash their paychecks, deposit the cash in the Waldorf Bank account, and issue checks on behalf of Mr. Goodman and Mr. Smythers. The total of these accommodation transfers, which took place over three years, was $896.06. A number of Waldorf Bank deposit slips show that small cash deposits, in the precise amounts of the paychecks, were made at the same time that Ryza issued checks which bore notations showing that they were for the benefit of either Mr. Goodman or Mr. Smythers. While Ryza was in New Jersey in 1965, her niece gave her $138.27 to pay the balance owing on her car. Ryza deposited the funds in the Waldorf Bank account and drew a check payable to the Potomac Bank and Trust Company to pay the balance owing on her niece's car.A notation on the front *394 of the Waldorf Bank check indicates that it was for the "balance on Joyce Gae's car." ULTIMATE FINDINGS OF FACT Petitioners should receive credit for the following transactions: 1. Transfers to L & L Enterprises of $3,076.85 for 1964 and $734.63 for 1965.
2. Loans to Janet Moschella of $1,331.76 and to Robert Jordan of $2,091.67. 3. "Accommodation transactions" involving Thomas Goodman and William Smythers of $896.06 and an "accommodation transaction" involving Joyce Gae of $138.27.
OPINION In this case, respondent used the bank deposits method to determine petitioners' income. When this method is applied, it is said that deposits, to the extent that they remain unexplained, may support a determination that they represent gross income for the year of deposit. John Harper,54 T.C. 1121 (1970). Due allowance must be made, however, for all deposits which are satisfactorily explained or otherwise shown to have been derived from nontaxable sources. Robert M. Brittingham,57 T.C. 91 (1971). Petitioners and respondent agree that there are some deposits in the Waldorf and Maryland National Bank accounts which are derived from nontaxable deposits. Petitioners and respondent disagree, however, *395 as to the preciseamounts of these nontaxable deposits. There are three possible sources for additional nontaxable deposits; we will treat each of them in turn. First, it is clear that the Waldorf Bank account was a conduit for funds belonging to L & L Enterprises and that such funds are not income to petitioners. Petitioners maintained the L & L checking account at the Potomac Bank and Trust Company, in Fairfax, Virginia, some distance from the L & L premises. In the day-to-day operation of its business, L & L would have substantial receipts. To transmit funds to the L & L account in Virginia, petitioners would deposit these receipts in the account at The Waldorf Bank, in Waldorf, Maryland. Ryza would then issue a check payable to L & Land send it to the Virginia bank for deposit in the L & Laccount. While respondent and petitioners agree that the Waldorf Bank account was a conduit for funds belonging to L & L Enterprises, respondent has not given Ryza [4] *397 credit for all checks written on the Waldorf Bank account to the order of L & L Enterprises. Respondent has apparently given Ryza credit if a deposit was made in the Waldorf Bank account and a corresponding amount was transferred *396 to L & L's account in Virginia. If, for example, a $1,000 deposit were made in the Waldorf Bank account and Ryza then drew a check to L & L Enterprises for $1,000, respondent would apparently give her credit. Petitioners contend that they should receive additional credit for some deposits in the Waldorf Bank account which were too small to write a check for a corresponding amount. They argue that in the case of these small deposits, Ryza would wait until a fairly substantial amount accrued in the Waldorf Bank account before writing a check for the aggregate of the small deposits to the order of L & L Enterprises. After reviewing the evidence, we agree with petitioners; our task is to decide the precise amount of the additional credit.We have compared the deposits in the Waldorf Bank account with the checks drawn to the order of L & L Enterprises and have concluded that petitioners should receive additional credit for transfers to L & L Enterprises of $3,076.85 for 1964 and $734.63 for 1965. Reid v. Commissioner,516 F. 2d 896 (2d Cir. 1975), affg. a Memorandum Opinion of this Court. The second source for nontaxable deposits is the repayment of certain loans. Petitioners introduced evidence to show that Janet Moschella, Lashley's sister, sometimes ordered furniture when she visited petitioners in Maryland; that the furniture company required payment before shipping furniture to Mrs. Moschella's home in New Jersey; that Ryza advanced Mrs. Moschella funds through checks drawn on the Waldorf Bank account; that Mrs. Moschella promptly reimbursed petitioners; and that the reimbursements were deposited in either the Waldorf Bank account or the Maryland National Bank account. Petitioners introduced a check stub and cancelled checks totaling $1,331.76, drawn on the Waldorf Bank account in 1965, payable to the furniture company. Two of the checks and the stub indicated that they were for Mrs. Moschella's benefit. Ryza and Mrs. Moschella both testified about the advances and the repayments. They were certain that all advances had been repaid by check, and Ryza was certain that the repayments had been deposited. Two of *398 Mrs. Moschella's reimbursement checks, in the amounts of $621 and $345, were introduced into evidence. One of these checks was deposited in the Waldorf Bank account and the other in the Maryland National Bank account. Although the reimbursement checks total only $966, we think the evidence is sufficient to provide petitioners with the full credit they request of $1,331.76. Evidence was also introduced to show that in 1964 a loan of $1,000 was made to Robert Jordan. Mr. Jordan was Lashley's brother-in-law and an employee of L & L Enterprises. In addition, checks totaling $1,091.67 were issued on Mr. Jordan's behalf payable to suppliers for building materials used by Mr. Jordan in constructing his own home. Suppliers' records confirm the purpose for the advances as do the stubs for the checks to suppliers. Mr. Jordan testified that he repaid the loan and the advances promptly. Petitioners also said that they were repaid and further testified that the repayments were deposited in the account from which the sums had been withdrawn. We think this evidence sufficient to provide petitioners with credit for their loans to Mr. Jordan. They should receive credit for $2,091.67. The *399 third source for nontaxable deposits might be termed "accommodation transactions." Two of the L & L mechanics, Thomas Goodman and William Smythers, had no checking accounts of their own. The evidence shows that they requested Ryza to issue checks on their behalf to pay their bills. Ryza testified that on payday she would cash their paychecks, deposit the cash from those paychecks in the Waldorf Bank account, and issue checks on their behalf. The total of these "accommodation transfers," which took place over three years, was $896.06. They were substantiated by a number of Waldorf Bank deposit slips which showed that small cash deposits, in the precise amounts of the paychecks, were made at the same time that Ryza issued checks which bore notations showing that they were for the benefit of either Mr. Goodman or Mr. Smythers.In light of this evidence, petitioners should receive credit for $896.06. Finally, there was one last accommodation transaction involving Joyce Gae, Ryza's niece, in the amount of $138.27. This transaction took place in 1965. Ryza testified that while she was in New Jersey, her niece gave her money to pay the balance owing on her car, that she deposited the *400 funds in the Waldorf Bank account, and that she drew a check payable to the Potomac Bank and Trust Company to pay the balance owing on the car. A notation on the front of the check indicates that it is for the "balance on Joyce Gae's car." This is sufficient evidence to provide petitioners with another credit for $138.27. Issue 3. Allowance for Ordinary and Necessary Business Expenses. FINDINGS OF FACT Woodrow W. Lashley, Jr., owned a home on Cobb Island, Maryland, which was destroyed by fire in January of 1965. Petitioners agreed to build a new home for him, and Lashley, Jr., agreed to pay petitioners for building the new home. As an advance toward the rebuilding of the Cobb Island home, Lashley, Jr., in March of 1965, endorsed over to the petitioners a $7,000 check which he received from his fire insurance claim. Petitioners deposited this check in the Maryland National Bank account. In March of 1966, when petitioners began construction of the new home on Cobb Island, Lashley, Jr., mortgaged another piece of property which he owned in Accokeek, Maryland, to defray the balance of the cost. He received $9,375.06 from mortgaging the Accokeek property. Between March and December *401 of 1966, petitioners expended $17,851.35 from the Maryland National Bank account for the construction of the Cobb Island home. The home was a cape cod brick dwelling with four bedrooms and two baths. Lashley, Jr., cashed the check which he had received from the mortgaging of the Accokeek property, and from time to time, as the work progressed, Lashley, Jr., reimbursed petitioners in cash from these funds. Petitioners, in turn, deposited these funds in the Maryland National Bank account to reimburse themselves for the expenditures which they had made from this account for building of the Cobb Island home. As noted in the Findings of Fact contained in Issue 1, petitioners owned a house in Lutherville, Maryland, which they used only while performing abortions. Petitioners incurred various expenses in maintaining and operating this property. In 1965, by checks drawn on the Maryland National Bank account, petitioners paid $562.84 in utility and maintenance expenses. In 1966, by checks drawn on the same account, they paid $240.30 for such expenses.There is no evidence on the record that petitioners previously deducted these expenses. ULTIMATE FINDINGS OF FACT Petitioners should receive *402 a credit of $17,851.35 for receipts from a nontaxable source. Petitioners incurred expenses of $803.14 during 1965 and 1966, while performing abortions. OPINION The issue is whether petitioners have received proper allowance for ordinary and necessary business expenses. The first such expense involves construction costs which petitioners incurred in building a home for Woodrow W. Lashley, Jr. While it is clear that petitioners incurred these expenses, they do not necessarily have a right to deduct them as ordinary and necessary business expenses under section 162. Lashley, Jr., merely reimbursed them for their expenses; petitioners apparently had no profit motive when they built the home. Indeed, it appears as though the home was built as a personal favor to Lashley, Jr. Accordingly, petitioners have no right to a business deduction. See generally Hirsch v. Commissioner,315 F. 2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Respondent has conceded, however, that petitioners have a right to receive credit for receipts from a nontaxable source for the reimbursed expenses--provided that the reimbursed funds were deposited in the bank accounts used in determining *403 petitioners' income under the bank deposits method. We are confident from the record that petitioners were reimbursed for their expenses and that they deposited the reimbursed funds in the Maryland National Bank account. Therefore, they have a right to a credit of $17,851.35 for receipts from a nontaxable source. Also at issue is $803.14 which petitioners allege they spent to conduct the abortion mill at the Lutherville premises. Their testimony was collaborated by cancelled checks payable to the gas and electric company, to the company that supplied fuel to the house, and to the maintenance man. Respondent contends that petitioners must prove that these expenses were not previously deducted. After examining the tax returns in question, we find no evidence that these expenses were previously deducted. These expenses [5] were ordinary and necessary business expenses; they are deductible. Issue 4. Loss from the Sale of Real Property. FINDINGS OF FACT In March of 1965, petitioners purchased a house *404 in Lutherville, Maryland, in Ryza's name, to perform abortions. This house was used solely for that purpose. Its purchase price was $21,000. Petitioners made $1,580.19 in capital improvements to this property, all of them necessary in performing abortions. The property was sold in August of 1966 for $18,000. Ryza's 1966 income tax return erroneously reported a gain from the sale of the Lutherville house when, in fact, a loss had been incurred. Although this real estate was placed in Ryza's name because of Lashley's merital problems, petitioners understood and agreed that it belonged to both of them. OPINION Respondent has conceded that there was an ordinary loss on the sale of the real estate. Respondent and petitioners also apparently agree on the amount of the loss. Therefore, we need only discuss the attribution of the loss. Respondent attributes the loss entirely to Ryza while petitioners divide it between them. As explained more fully in the first issue, petitioners put all real estate in Ryza's name though they understood and agreed that it belonged to them equally. They felt compelled to do this because of Lashley's marital problems. Therefore the loss on the sale *405 of the Lutherville house should be divided between petitioners and not attributed solely to Ryza. Issue 5. Income Averaging. FINDINGS OF FACT Although respondent did not introduce into evidence the original tax returns of Ryza for 1963 and 1962, petitioners introduced duplicates of the originals into evidence. Ryza's 1963 return shows adjusted gross income of $3,017.68. During 1963, over $44,000 was deposited in the Waldorf Bank account. Ryza wrote checks on the Waldorf account in 1963 to L & L Enterprises in the amount of $19,140.93. Ryza indicated on her 1962 income tax return that she had filed a tax return for 1961. There is no evidence on the record to indicate Ryza's income for 1961. Ryza did not file an income tax return for 1960 because she had insufficient income to do so; she was being supported by a male friend. Although respondent did not introduce into evidence the original tax returns of Lashley for 1964, 1963, or 1962, Lashley introduced duplicates of the originals into evidence. Lashley's 1963 return shows adjusted gross income of $3,725. Lashley filed no income tax returns for 1961 or 1960 since he was in the penitentiary during those years and had no taxable *406 income.
ULTIMATE FINDINGS OF FACT Ryza has established her income for 1960, 1962 and 1964 through 1966. She has not established her income for 1961 or 1963. Lashley has established his income for 1960 through 1962 and 1964 through 1966. He has not established his income for 1963. OPINION The fifth and final issue is whether petitioners may average their income. Fortunately the parties have narrowed the issue to the question of whether the petitioners have established their base period incomes. In short, the "base period incomes" are the incomes for the four years previous to the "computation year." The computation year, in turn, is the taxable year for which the taxpayer chooses the benefits of income averaging. Sec. 1302. Obviously, it is necessary to establish the base period incomes or the average income cannot be calculated. In the case of Ryza, we have no trouble in calculating the income for 1966, 1965, or 1964 [6] since that is precisely one of the purposes of this opinion. For 1963, Ryza introduced a duplicate of her return. Respondent did not *407 introduce the original return. Respondent casts serious doubt, however, on the accuracy of Ryza's 1963 return by pointing out that she reported adjusted gross income during 1963 of only $3,017.68 while depositing over $44,000 in the Waldorf Bank account. Ryza did not object at trial to the introduction of the checks and bank statements which showed over $44,000 in deposits in 1963. She now objects, however, because respondent merely introduced these checks and statements at trial and did not ask her to explain the source of the deposits. Ryza's argument ignores the obvious. Ryza understood (or should have understood) better than anyone the disparity between the adjusted gross income reported on her return and the amount of the 1963 deposits in the Waldorf Bank account. She has the burden of proof and should have explained the disparity if she had a legitimate explanation. It was not respondent's obligation to ask Ryza questions about the source of the deposits. Ryza wrote over $19,000 in checks in 1963 to L & L Enterprises. Even if we assume the Waldorf Bank account was used in 1963 as a conduit for L & L funds, this still leaves approximately $25,000 in deposits in the Waldorf *408 Bank account. This casts such serious doubt on the accuracy of Ryza's 1963 return that we hold she has failed to prove her income for that year. Mark P. Binstein,T.C. Memo. 1973-100. Petitioner also advances other arguments to overcome the effects of depositing approximately $25,000 in unexplained funds in a bank account and reporting a gross income of $3,017.68.She contends that respondent's answer on this issue was insufficiently clear. If Ryza felt that respondent's answer was insufficiently clear, this Court has well-established procedures to assure clarification. Ryza also argues that respondent should have alleged additional income for 1963 as part of his own averaging computation and that she should have been afforded the right to challenge this determination in court. To support her position, she cites Robert W. Unser,59 T.C. 528 (1973); Elmer Krassner,T.C. Memo. 1974-223; and Rev. Rul. 74-61, 1974-1 C.B. 239. We have carefully reviewed these cases and see nothing to support Ryza's position. Indeed, if anything, Unser holds the opposite for at 531 we state "that petitioners [not respondent] are required to use the correct taxable income" in determining averagable income. *409 [Emphasis added.] She has the burden of proof. When a taxpayer, such as Ryza, deposits over $25,000 in unexplained funds in a bank account but reports only slightly over $3,000 in adjusted gross income, we see no reason, factual or legal, to hold for such a taxpayer. Ryza also introduced her 1962 income tax return into evidence. Respondent did not introduce the original. Apparently it has been destroyed. We find no evidence in the record to doubt that Ryza's return for 1962 is accurate. Ryza testified at trial that she did not file an income tax return for 1960 or 1961 because she was being supported by a male friend. Ryza indicated on her 1962 income tax return, however, that she filed a tax return for 1961. Obviously a return filed in 1962 is better proof of whether Ryza filed a return in 1961 than her testimony at trial. We will not accept the 1962 return as an accurate reflection of 1962 income while denying the accuracy of the return when it indicates that Ryza filed a return for 1961. Therefore, we conclude that Ryza has failed to show the amount of her income for 1961. Mark P. Binstein,supra.There is not sufficient evidence on the record to indicate that Ryza *410 filed a return for 1960. She says she did not file because she had insufficient income and was being supported by a friend. We accept this testimony. In the case of Lashley, we, of course, have no trouble in determining income for 1966 and 1965 since that is one of the purposes of this opinion. For 1964 Lashley has submitted a duplicate of his return to the Court. He admits that this return is incorrect and that it should include his share of the unreported income for 1964 since he and Ryza were partners in their various enterprises. Robert M. Unser,supra.
For 1963, Lashley introduced a duplicate of his return into evidence; this return shows adjusted gross income of $3,725. In the first issue, we held that the funds in the Waldorf Bank account belonged equally to Lashley and Ryza although the account was in Ryza's name. Therefore, Lashley now has the same problem as Ryza--large unexplained deposits in a bank account. We hold, as in the case of Ryza, that Lashley has failed to prove his income for 1963. The 1963 deposits in the Waldorf Bank account simply cast too serious a doubt on the accuracy of Lashley's 1963 return. We see no reason to doubt the accuracy of Lashley's *411 return for 1962. In 1961 and 1960 he was in the penitentiary and had no income to report.
Lashley has failed to establish his income for 1963, and Ryza has failed to establish her income for 1961 and 1963. Since petitioners must establish their base period incomes for the purpose of income averaging and since 1961 and 1963 constitute base period years for petitioners, they may not average their income. Decisions will be entered under Rule 155. Footnotes
1. The original statutory notice asserted a deficiency for 1964 of $10,268.91 and an addition to tax of $5,134.45. When the trial began, respondent, pursuant to leave of this Court, amended his answer to claim the greater amounts set forth in the text. Petitioner Ryza had no objection to respondent's amendment of his answer. ↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended. ↩
3. The original statutory notice asserted the following deficiencies and additions to tax: Addition to Tax Year
Deficiency
Under Sec. 6653(b)
1965
$50,358.78
$25,179.39
1966
46,546.25
23,273.12
When the trial began, respondent moved orally for leave to amend his answer to claim the greater amounts set forth in the text. Petitioner Lashley did not object to respondent's motion. This Court granted respondent's motion to amend his answer and subsequent to trial, it was so amended.↩
4. In the first issue we held that the unreported income should be divided evenly between Ryza and Lashley. Obviously any credits which respondent has given Ryza and any additional credits we find should also be divided evenly between the petitioners.
5. Although these expenses were related to illegal activities, respondent does not object to deducting them because they were so related. See Commissioner v. Sullivan,356 U.S. 27↩ (1958).
6. Whether a given year is a base period year or a computation year depends upon the particular five-year period being averaged.↩