SALATHEA REID, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reid v. Commissioner
Docket No. 878-88
United States Tax Court
T.C. Memo 1989-407; 1989 Tax Ct. Memo LEXIS 405; 57 T.C.M. (CCH) 1211; T.C.M. (RIA) 89407; August 7, 1989
*405 During 1979 and 1980, petitioner was the payee of several checks issued by Quality Labs. Petitioner endorsed these checks and gave them to her husband, a physician, who either deposited the checks or cashed them. Petitioner at no time performed any services for Quality Labs. Held: The proceeds of such checks are not income to petitioner; although petitioner derived some benefit from such proceeds, she was not their true earner. Neither was petitioner an active participant or essential element in any kickback scheme which might involve her husband and Quality Labs. Held further: Petitioner is not liable for an addition to tax pursuant to section 6654 for failure to pay estimated tax. Matthew Curtiss, for the petitioner. Dennis G. Driscoll, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By statutory notice dated October 20, 1987, respondent determined deficiencies in and additions to petitioner's Federal income taxes for the years and in the amounts as follows: Additions to Tax
Section
Section
Year
Deficiency
[1] *406 6653(b) 6654
1979
$ 17,536
$ 8,768
$ 730  1980
17,990  8,995  1,150  After concessions [2] the issues are whether checks issued to petitioner by Quality Clinical Laboratories, Inc. (Quality Labs) are taxable in whole or in part to her, whether petitioner is liable for an addition to tax for failure to pay estimated tax pursuant to section 6654, and petitioner's filing status. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated by this reference. At the time she filed her petition, petitioner resided in Southfield, Michigan. In 1976, while she was a student nurse at Detroit Memorial Hospital, petitioner met Dr. Larry Reid (Reid) who was one of the *407 hospital's resident physicians. Petitioner and Reid were married on March 3, 1979, and set up residence at petitioner's home in Southfield. Before their marriage, petitioner and Reid opened joint checking and savings accounts at the Bank of the Commonwealth. The names on the accounts were "Salathea Moore or Dr. Larry H. Reid." Reid opened the accounts ostensibly to provide petitioner with financial security, as they were not yet married but he wanted to have a child as soon as possible. Petitioner also opened a savings account at Detroit Bank & Trust Co. prior to her marriage to Reid. The names on this account were Salathea Conwell and Mary Moore, who is petitioner's mother. This account was opened at Reid's request. Reid told petitioner that the account was so he could cash checks written in her name at that bank. Sometime in 1978, Quality Labs began issuing checks in petitioner's name. Several of these checks had already been issued by the time Reid requested that petitioner set up the savings account at Detroit Bank & Trust in the name of herself and her mother. Reid brought these checks to petitioner telling her that since he had income from so many other sources, he had *408 put some of his income in her name to keep it separated. All of the checks issued to petitioner by Quality Labs were brought to her by Reid. Petitioner had never heard of Quality Labs at the time Reid began bringing the checks to her. The checks made payable to petitioner totaled $ 40,450 in 1979 and $ 38,560 in 1980. On the first few occasions that Reid brought these checks to petitioner, she would endorse them and the two of them would go to the bank and cash the checks, with Reid keeping the proceeds. However, after a period of time, petitioner no longer accompanied Reid to the bank to cash the checks. A large portion of the money from these checks made its way into the checking account jointly held by petitioner and Reid which petitioner used for the family's household expenses. On some occasions, Reid was not able to cash the checks (upon which his name did not appear) due to the absence of a teller with whom he was familiar, and he would be required to deposit the checks. Total deposits of checks from Quality Labs [3] into bank accounts over which petitioner had signatory authority totaled $ 31,530 for 1979 and $ 21,850 for 1980. Of the amount deposited in 1979, $ 4,900 *409 was deposited in accounts over which petitioner had sole signatory authority or just signatory authority with her mother, while $ 26,630 was deposited into the accounts over which Reid also had signatory authority. All of the deposits made in 1980 were deposited in the latter accounts. [4]
Upon petitioner's initial inquiry of Reid as to the nature of the checks she was endorsing, she was told merely to endorse the checks, that the proceeds were Reid's money and that another doctor and his wife were doing the same thing. When petitioner later continued her inquiry, Reid's reaction was of a threatening nature, and she did not persist. In late 1980 or early 1981, petitioner was hospitalized due to complications of *410 pregnancy. During her hospitalization, Reid brought her at least one check for endorsement. At about this same time, their marriage began to deteriorate, and upon her return home from the hospital petitioner refused to endorse any more checks. Petitioner and Reid became separated in January 1981, and petitioner filed for divorce in June 1981, which was subsequently granted. On or about April 20, 1978, petitioner signed a "CONSULTANT/COMMISSION AGREEMENT" (consultant agreement) with Quality Labs whereby [petitioner] shall hold herself out to all others * * * as a representative for the sole purposes of securing accounts, contracts, service arrangements and any such business arrangement which will cause to inure to the benefit of [Quality Labs'] pecuniary benefit as a result of those business activities engaged in by [Quality Labs]. Pursuant to this contract, Quality Labs was to pay petitioner a commission of 25 percent of the gross profit for any business brought in as a result of petitioner's services. At trial, petitioner denied any recollection of having signed any such agreement, even though her purported signature was identified as such by a handwriting expert of the Michigan *411 State Police. During the years before the Court, petitioner did not perform any services for Quality Labs, whether pursuant to this contract or otherwise. An investigation of Quality Labs by the Health Care Fraud Division of the Michigan Attorney General's office found no evidence that petitioner ever performed services to justify the issuance of checks to her by Quality Labs. OPINION Respondent makes two arguments in favor of taxing to petitioner all or part of the proceeds of the checks from Quality Labs made payable to her. First, respondent argues that petitioner had dominion and control over the proceeds of those checks since they were endorsed by her and deposited in bank accounts over which petitioner had signatory authority, and that they are therefore taxable to petitioner in their entirety. Secondly, respondent argues that petitioner was actively involved in an illegal medicaid kickback scheme [5] *412 with Reid and one-half of the proceeds of the checks are income to her for that reason. We think neither argument has merit, and find for petitioner on this issue. With respect to respondent's first argument, petitioner argues that "mere receipt and possession of money does not by itself constitute taxable income." Estate of Lashelle v. Commissioner, 208 F.2d 430, 435 (6th Cir. 1953). Neither is mere dominion over money the decisive factor. Brittingham v. Commissioner, 57 T.C. 91, 101 (1971). See also Commissioner v. Wilcox, 327 U.S. 404 (1946). Rather, the status as taxable income of any real or nominal accretion to wealth must be viewed according to the facts and circumstances of each particular case. This is especially true in the husband and wife context where one spouse, through either choice or necessity, does not work outside of the home and the other spouse is the family's sole means of support. Under these circumstances, respondent's argument that the majority of the proceeds of checks made payable to petitioner was deposited into accounts over which she had signatory authority carries little weight, especially since Reid had authority over the accounts into which a majority of those deposits were made. Furthermore, as we discuss in greater *413 detail below, we are satisfied that petitioner had no earned income during the years before the Court. We are reluctant to view petitioner's signatory authority over those accounts as a significant factor in determining whether the checks from Quality Labs constitute income to her since on this record it is her husband, who also had signatory authority over the accounts into which a majority of the deposits were made, who was the actual earner of the checks so deposited. Neither do we find it dispositive, or even very persuasive, that petitioner should be taxed on the proceeds of those checks by reason of her endorsement. Regardless of whether Reid was in fact engaged in an illegal kickback scheme, it is apparent on this record that petitioner was no more than his agent for receipt of funds from Quality Labs. We found petitioner to be a credible witness, and we accept her testimony to the effect that the disposition of the proceeds from those checks was within the sole discretion of Reid. Respondent's second argument requires us to assume, for purposes of this argument only, that Reid and Quality Labs were in fact engaged in an illegal kickback scheme. In support of this argument, *414 respondent cites several cases which stand for the proposition that an individual is taxed on a portion of the proceeds from an illegal operation if his participation was active or essential to its success. See Puppe v. Commissioner, T.C. Memo. 1988-311; Cipparone v. Commissioner, T.C. Memo. 1985-234; Ash v. Commissioner, T.C. Memo. 1974-219, affd. Cannon v. Commissioner, 533 F.2d 959 (1976). Respondent also cites Mich. Comp. Laws Ann. sec. 14.375(22) (West 1989), which states that a person licensed to practice medicine in the State of Michigan may not receive a fee or other remuneration from a clinical laboratory for submitting specimens or cultures to that laboratory. However, a lay person is under no such restriction. Respondent in effect argues that since Reid was precluded from receiving such fees, he and petitioner arranged with Quality Labs for petitioner to enter into the consulting agreement with Quality Labs whereby petitioner was to act as a salesman for the latter, receiving a commission lawful in form only. Petitioner did not recollect signing the April 20, 1978, consulting agreement. However, we have found as a fact that she did indeed sign that document. Our conclusion *415 in this respect is based upon the testimony of respondent's expert witness, Robert D. Kullman, a sergeant with the Michigan State Police specializing in document examination. Petitioner argues that if she did sign the consulting agreement, she was fraudulently induced to do so. We need not consider petitioner's argument in this respect, as we find that the events which transpired during the years before the Court do not support a conclusion that petitioner ever performed any services under the agreement. Assuming as we do for purposes of this argument only that Reid and Quality Labs were engaged in a scheme whereby Reid was to receive a percentage of the gross fee for every lab test which he referred to Quality Labs, we find that petitioner played no part in that scheme. We found petitioner to be a credible witness, and her testimony supported by the remainder of the record. The only evidence that petitioner had any earned income during 1979 and 1980 is her signature on the consulting agreement pursuant to which she was to have performed services to Quality Labs. Petitioner's signature on the consulting agreement is some evidence tending to show that petitioner performed compensable *416 services for Quality Labs. However, it is contradicted both by petitioner's own credible testimony and the investigation conducted by the Health Care Fraud Division of the Michigan Attorney General's office. Further, petitioner's inquiry of her husband concerning the source of the checks would not have elicited a threatening response had petitioner actually earned those funds. Finally, the cases cited by respondent are distinguishable in that they taxed income to the parties to an illegal scheme only when those parties were active in the scheme or essential to its successful completion. Such is not the case here. Petitioner was not active in any such scheme, and was in fact kept ignorant of Reid's business affairs. Petitioner was merely Reid's unwitting agent for diverting to his own use fees which he was precluded by statute from receiving. We note that this is not an innocent spouse case, and the question of whether or not petitioner knew or should have known of Reid's activities is irrelevant. We are merely concerned with whether or not petitioner actually earned the income which respondent has imputed to her. We find that she has not and hold for petitioner on this issue. *417 Respondent has also determined that petitioner is liable for an addition to tax pursuant to section 6654 for failure to pay estimated self-employment taxes pursuant to section 1401. A holding for respondent on this issue is dependent upon our holding concerning the checks issued by Quality Labs. As we have held for petitioner on that issue, we also hold for petitioner with respect to the addition to tax. Accordingly, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.
2. Respondent has conceded that petitioner is not liable for an addition to tax for fraud. Petitioner has conceded that she has no proof with respect to certain rental and interest income and therefore could not satisfy her burden pursuant to Rule 142(a). Petitioner did not address the issue of her filing status either at trial or on brief, and is therefore deemed to have conceded that issue.↩
3. Petitioner does not argue that any of these deposits were receipts from Reid's medical practice. ↩
4. The parties prepared and stipulated to a schedule setting forth the deposits into each account over which petitioner had signatory authority. That schedule shows that two additional deposits in the amounts of $ 1,000 and $ 900 were made on July 13, 1979, and August 3, 1979, respectively. However, the schedule does not indicate which account was the recipient of those deposits.↩
5. A finding with respect to the existence of such a scheme is unnecessary to our resolution of this case. We would note, however, that Quality Labs was under indictment for medicaid fraud at the time of trial.