T.C. Memo. 2019-42

UNITED STATES TAX COURT

KEITH A. BOLLES AND SHELLEY R. BOLLES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11997-14.                              Filed April 25, 2019.

Edith Faye Moates, for petitioners.

G. Chad Barton, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge: In a notice of deficiency dated February 21, 2014, respondent determined a deficiency in Federal income tax of $16,745 for petitioners' tax year 2010.[1] After concessions, the issues for decision are:

---

[1]Unless otherwise indicated, all section references are to the Internal
(continued...)

[*2] (1) whether petitioners failed to report gross receipts from Mr. Bolles'

masonry business on Schedule C, Profit or Loss From Business, (2) whether

petitioners are entitled to deductions for contract labor expenses and adjustments

for cost of goods sold for Mr. Bolles' masonry business, (3) the amount of

guaranteed payments Mr. Bolles received from Oklahoma Power Contracting,

LLC (OPC), (4) whether petitioners are entitled to a car and truck expense

deduction for mileage driven for OPC, and (5) whether petitioners are entitled to a

casualty loss deduction.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first

stipulation of facts and the related exhibits are incorporated herein by this

reference. Petitioners resided in Oklahoma when they timely filed their petition.

---

[1](...continued)
Revenue Code in effect for the year in issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

[2]Petitioners concede that: (1) they are not entitled to the rent/lease
deduction of $4,512 for 2010 claimed on a second Schedule C for OPC; and
(2) the guaranteed payments Mr. Bolles received from OPC should have been
reported on Schedule E, Supplemental Income and Loss, instead of Schedule C.
The parties agree that Mr. Bolles sold his interest in OPC in 2010 at a gain of
$15,000 and that the gain is taxed as a capital gain. Petitioners failed to report the
$15,000 gain on Schedule D, Capital Gains and Losses. These concessions are
binding in the Rule 155 computations.

[*3] <u>Background</u>

Petitioners married in 1985. During the course of their marriage, petitioners had three sons, two of whom they claimed as dependents on their Federal income tax return for 2010. Mrs. Bolles was a homemaker and Mr. Bolles was trained as a mason. In the mid to late 1990s petitioners and the owners of a deteriorated residence on Running Deer Road (Running Deer property) agreed that petitioners would purchase the Running Deer property after renovating it to the point where it would qualify for a residential mortgage of $108,000. The Running Deer property was a 4.27-acre lot in Cleveland County, Oklahoma, containing an approximately 2,000-square-foot house, a 512-square-foot in-ground pool, and a pool house. Over the next 10 to 15 years, petitioners replaced the house roof, dealt with termites, fixed structural problems, poured new concrete, laid stone work, built an outdoor patio with a custom fireplace, replaced the pool liner, fixed up the pool house, and renovated part of the kitchen. Petitioners did the work on the property themselves where Mr. Bolles' skills as a mason were useful. In 2008 the Running Deer property qualified for a $108,000 mortgage, and petitioners purchased the property. In 2010 they built a 30- by 40-foot shed (30 x 40 shed) for $7,200.

[*4]   On May 10, 2010, an EF5 tornado[3] swept through Cleveland County.[4]  A neighbor's house was lifted from its foundation and dropped on petitioners' house, destroying both.  Petitioners' insurance company determined that their house was a total loss.  After the extensive cleanup of the Running Deer property, the only remaining fixture was the concrete slab for the 30 x 40 shed.  Petitioners' insurance company paid them $235,526.50 for the loss of their house and for pool

---

[3]An EF5 tornado on the Enhanced Fujita scale has wind gust speeds over 200 miles per hour and can cause the highest degree of damage to a one-family residence.  The expected damage is the "[d]estruction of engineered and/or well constructed residence; slab swept clean".  NOAA/National Weather Service, Enhanced F Scale for Tornado Damage, https://www.spc.noaa.gov/efscale/ ef-scale.html (last visited April 3, 2019); NOAA/National Weather Service, One- and Two-Family Residences (FR12), https://www.spc.noaa.gov/efscale/2.html (last visited April 3, 2019).

[4]On May 24, 2010, then President Obama declared that a major disaster existed in the State of Oklahoma affecting individuals and households in Carter, Cleveland, McIntosh, Okfuskee, Oklahoma, Pottawatomie, and Seminole counties. Petitioners' residence was among the 282 residences that were destroyed.  FEMA, Oklahoma Severe Storms, Tornadoes, and Straight-Line Winds (DR-1917), https://www.fema.gov/disaster/1917 (last visited April 3, 2019); FEMA, Oklahoma - Severe Storms, Tornadoes, and Straight-Line Winds, FEMA-1917- DR, Declared May 24, 2010, https://www.fema.gov/pdf/news/pda/1917.pdf (last visited April 3, 2019).

[*5] and debris cleanup.[5]  The $235,526.50 did not include the cost of replacing the 30 x 40 shed, the pool house, or any of the other outdoor fixtures.

Petitioners were also paid $98,451, the limit on their insurance policy for personal property, for the contents of their house, pool house, 30 x 40 shed, and backyard.  The list of personal property submitted to the insurance company fills 32 pages and identifies hundreds of items the tornado destroyed.  Some descriptions are specific, e.g., "Trailer Magic 2 Horse Slant Trailer", while others are more general, e.g., "Pool Sticks".  For each item (or category of items) listed on the inventory, the insurance company made entries in designated columns for: (1) quantity of items destroyed, (2) age of the item, (3) original cost, and (4) actual cash value (i.e., replacement cost).  The insurance company valued the list of personal property before depreciation at $180,392.99 and after depreciation at $124,332.76--a 31% depreciation rate.  That amount did not include clothing, shoes, or accessories for petitioners and their two dependent sons or those sons' sports gear, electronics, and toys.

---

[5]Petitioners' insurance company valued the cost of replacing their house and debris cleanup at $269,040.70.  It then deducted "Non-Recoverable Depreciation" of $4,970.37, "Excess" of $27,543.83, and a deductible of $1,000 to arrive at the "Net Claim" of $235,526.50.  The "Net Claim" included $20,571.42 for debris cleanup and $34,385.87 for renovations for petitioners' replacement house.

[*6]   On the basis of the previous insurance documents petitioners later created a list of their destroyed personal property.  Petitioners used schedules 12, 13, and 14--men's clothing, women's clothing, and children's clothing--in Publication 584, Casualty, Disaster, and Theft Loss Workbook (rev. June 2012), to create some of their list.  On those schedules petitioners made entries for (1) quantity of items, (2) cost or other basis, and (3) casualty loss.  They valued as of immediately before the loss both of their dependent sons' clothing, shoes, and accessories at $4,566, Mr. Bolles' clothing, shoes, and accessories at $3,455, and Mrs. Bolles' clothing, shoes, and accessories at $5,640.  They also valued as of that time their dependent sons' sports gear,[6] electronics, and toys at $2,902.  Petitioners also had a Chevy z71 off-road pickup truck, an old Jeep, and a horse trailer that were destroyed by the tornado but that insurance did not cover.

Petitioners purchased a replacement house and property for $175,000 on July 14, 2010.  Mr. Bolles spent the next several months renovating the house and abating mold.  Petitioners' insurance company extended the limit on their coverage to pay the $34,385.87 renovation cost.

---

[6]One of petitioners' sons was on a baseball team and had competition-quality gloves, bats, and catcher's gear.

**[*7]** OPC

Mr. Bolles, Jason Burks, Brandon Moyer, and Monte Holland formed OPC, a multimember limited liability company taxed as a partnership for Federal income tax purposes.[7] On March 11, 2009, Mr. Moyer filed articles of organization for OPC with the Oklahoma secretary of State. Mr. Moyer and Mr. Holland contributed cash in exchange for their 25% interests. Mr. Burks and Mr. Bolles contributed services in exchange for their 25% interests. Mr. Bolles also contributed the use of his 2008 GMC truck and his Caterpillar 287 skid steer loader (skid loader) with trailer to OPC. Mr. Bolles kept the title and financing of the GMC truck and skid loader in his name, but OPC made the monthly payments and paid for fuel. Mr. Bolles used an OPC debit card to fuel his GMC truck, other foremen's trucks, his skid loader, and any other machinery used on a job.

OPC performed power line services in Kansas, Iowa, and Oklahoma. OPC contracted with electric providers to install aboveground and underground power lines and poles (regular contracts) and repair downed poles and power lines from storms (storm contracts). Mr. Burks and Mr. Bolles acted as foremen for crews performing work for OPC. OPC agreed to guaranteed payments for their services.

---

[7]OPC is not an entity subject to the TEFRA partnership audit rules because it had 10 or fewer members who were all United States persons during 2010. See sec. 6231(a)(1)(B).

[*8] If they installed poles and power lines under a regular contract, OPC paid them $1,000 per week. If they repaired poles and power lines under a storm contract, OPC paid them $1,750 per week. Mr. Bolles' worked at least 50 hours per week and often longer. In addition to the fixed payments on regular and storm contracts, OPC provided a fixed payment of $250 for meals and incidentals for each week Mr. Bolles worked out of town.

In 2010 OPC rented two houses in Kansas for the crew to stay at while on a regular contract, but Mr. Bolles paid the local utilities for the rentals. In 2010 OPC also paid for the 15-man crew to stay at a motel when they were on a storm contract. The motel would not take OPC's business check, so Mr. Bolles wrote an OPC check out to himself, cashed it, and paid the motel in cash for the entire crew.

From January 6 to June 4, 2010, OPC issued to Mr. Bolles 26 checks totaling $51,970.31. Seven of those checks included reimbursements for OPC expenses totaling $2,150 that Mr. Bolles paid on its behalf.[8] Seventeen of those checks included fixed payments for meals and incidentals for each week of out-of-town travel totaling $4,250. After deducting the expense reimbursements, Mr. Bolles' guaranteed payments totaled $49,820.31.

---

[8]In addition to paying the utilities of OPC crew rental properties, Mr. Bolles often purchased lunch for the OPC crews to minimize downtime.

**[*9]** OPC had a long-term contract with an electric cooperative in Kansas to install aboveground power lines. At the end of the contract the cooperative claimed OPC did not perform on the contract. In May and the beginning of June 2010 Mr. Bolles and Mr. Burks went to Kansas to investigate the claim. Mr. Bolles was paid $1,000 for each week he investigated in Kansas.

During the contract dispute Mr. Moyer offered to pay Mr. Bolles and Mr. Burks a total of $30,000 for their 25% interests in OPC. On June 17, 2010, Mr. Bolles and Mr. Burks signed an "Offer of Sale of Membership Interests" wherein each agreed to sell his 25% interest to Mr. Moyer and Mr. Holland. On June 17, 2010, Mr. Moyer and Mr. Holland signed an "Acceptance of Offer" and paid Mr. Bolles and Mr. Burks $15,000 each for their 25% interests in OPC.

When Mr. Bolles and Mr. Burks sold their collective 50% interest, OPC did not close its tax year. Similarly, OPC did not issue a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., to Mr. Bolles or Mr. Burks for 2010. On November 14, 2013, OPC filed a delinquent 2010 Form 1065, U.S. Return of Partnership Income, reporting a $55,559 loss.[9] There were no Schedules K-1

---

[9]The terminated partnership return was due on the 15th day of the 4th month following the sale of 50% of the partnership (which resulted in its termination). See secs. 706, 708; sec. 1.6031(a)-1(e)(2), Income Tax Regs.

[*10] attached to its Form 1065.  OPC did not keep books or records for the partners' capital accounts.[10]

Masonry Business

After selling his interest in OPC Mr. Bolles spent several months cleaning up the Running Deer property and renovating petitioners' replacement house.  Mr. Bolles then returned to his former trade of masonry work, doing business under both his own name and Red Dirt Contracting, LLC (Red Dirt).  He also worked with his nephew's company, Foundation Pro, LLC, doing masonry work.  As a convenience to his nephew, Mr. Bolles had signatory authority on Foundation Pro's business bank account but did not receive a debit card or use the account.[11]  Mr. Bolles' nephew deposited all the checks into Foundation Pro's bank account and used those funds to pay business expenses and personal expenses.  With the exception of one check, all the checks deposited into Foundation Pro's bank account were written to the business.  The one exception was endorsed as: "Keith

[10]The only document in the record from OPC is a profit and loss statement from January through December 2010.  There is no partnership agreement, operating agreement, capital accounts statement, or any other documentation in the record that would show Mr. Bolles' basis in OPC or how OPC determined how to treat amounts paid to Mr. Bolles.

[11]The record contains Foundation Pro's bank account statements for September, October, November, and December 2010.

[*11] Bolles Attributable to Foundation Pro For Deposit Only". Checks to pay for Mr. Bolles' masonry work were written either to him personally or to Red Dirt. Foundation Pro issued Mr. Bolles one check for $2,241.17 for his services that he deposited into petitioners' joint checking account.

Mr. Bolles received $9,926.17 for his masonry work in November 2010 and $19,535.87 in December 2010, and he deposited the former into petitioners' joint bank account and the latter into Red Dirt's bank account. During December 2010[12] Red Dirt paid $6,723.15 to concrete suppliers, brick companies, and other construction supply businesses. Red Dirt also paid $6,354.50 to nine individuals for contract labor in December 2010. All but one of the payments for contract labor were less than $600. Mr. Bolles did not issue any Forms 1099-MISC, Miscellaneous Income, reporting the amounts paid. Mr. Bolles did not report any cost of goods sold for materials, nor did he deduct any contract labor expenses on the 2010 tax return.

Tax Return and Notice of Deficiency

Petitioners hired a paid tax return preparer to prepare their 2010 Form 1040, U.S. Individual Income Tax Return. They reported gross receipts of $20,228 and

---

[12]The record contains Red Dirt's bank account statement for only December 2010.

[*12] total expenses of $14,221 on Schedule C for Mr. Bolles' masonry business and gross receipts of $45,121[13] and total expenses of $20,400 on a second Schedule C for OPC. They reported adjusted gross income of $14,065 and claimed a refund of $4,698. Petitioners' did not claim cost of goods sold, a deduction for contract labor expenses, or a deduction for a casualty loss on their 2010 Form 1040. Similarly, petitioners did not report any of Foundation Pro's income or claim any deductions related to Foundation Pro.

Respondent issued to petitioners a notice of deficiency dated February 21, 2014, for their 2010 tax year. Respondent determined, among other things, that petitioners (1) had additional gross receipts of $10,064 from Mr. Bolles' masonry business, (2) were not entitled to deduct car and truck expenses of $15,106 from OPC,[14] and (3) had guaranteed payments of $66,521 from OPC.[15] Through a bank

---

[13]Mr. Bolles did not receive a Schedule K-1. Mr. Bolles called Mr. Moyer to find out the amount OPC paid him.

[14]Respondent did not disallow deductions for legal and professional services and office expenses on petitioners' Schedule C for OPC.

[15]The notice of deficiency states: "We adjusted your guaranteed payments in accordance with the examination results of the Partnership return, Oklahoma Power Contracting." The record does not reflect whether the adjustment took into account that Mr. Bolles' tax year for OPC closed on June 17, 2010, and that OPC filed a return for the entire 2010 tax year without attaching Schedule K-1 to report Mr. Bolles' share of the profits and losses of OPC.

[*13] deposits analysis respondent determined that Mr. Bolles received gross receipts of $30,292.04 for his masonry business for 2010.

OPINION

I.      Masonry Business

A.      Unreported Income

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). When a case involves unreported income, the U.S. Court of Appeals for the Tenth Circuit, to which this case would be appealable absent a stipulation to the contrary, see sec. 7482(b); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), has held that the Commissioner's determination of unreported income is entitled to a presumption of correctness once some substantive evidence is introduced demonstrating that the taxpayer received unreported income, United States v. McMullin, 948 F.2d 1188, 1192 (10th Cir. 1991). Once the Commissioner introduces some substantive evidence linking the taxpayer to the income, the presumption of correctness applies and the burden shifts to the taxpayer to produce substantial evidence overcoming it. Id.

**[*14]** Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), aff'd, 566 F.2d 2 (6th Cir. 1977). The Commissioner is not required to show a likely source of income. See Estate of Mason v. Commissioner, 64 T.C. at 657. The bank deposits method presumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income, but the Government must take into account any nontaxable source or deductible expense of which it has knowledge. DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

Unless the nontaxable nature of deposits is established, gross income includes deposits to bank accounts where the taxpayer has dominion and control of the funds. Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955); Davis v. United States, 226 F.2d 331, 334-335 (6th Cir. 1955); Manzoli v. Commissioner, T.C. Memo. 1988-299, aff'd, 904 F.2d 101 (1st Cir. 1990). The use of money for personal purposes is an indication of dominion and control. Woods v. Commissioner, T.C. Memo. 1989-611, aff'd without published opinion, 929 F.2d 702 (6th Cir. 1991). Mere dominion over money does not by itself constitute taxable income. See Brittingham v. Commissioner, 57 T.C. 91, 101 (1971); see also Commissioner v. Wilcox, 327 U.S. 404, 407 (1946). Rather, the

**[*15]** status as taxable income of any real or nominal increase to wealth must be viewed according to the facts and circumstances of each particular case. See, e.g., Reid v. Commissioner, T.C. Memo. 1989-407. If a taxpayer can show that he accrued no gain or benefit and had mere dominion over the funds without control, he could rebut the presumption that the funds are taxable to him. See Brittingham v. Commissioner, 57 T.C. at 101; Kramer v. Commissioner, T.C. Memo. 1996-513.

Gross Receipts

Mr. Bolles reported gross receipts of $20,228 on Schedule C for his masonry business for 2010. Through a bank deposits analysis respondent determined that Mr. Bolles received gross receipts of $30,292.04 for his masonry business for 2010. On brief respondent argues that Mr. Bolles actually received gross receipts of $39,963.04 and, therefore, the adjustment to income of $10,064 in the notice of deficiency should be sustained.

Respondent introduced into evidence Foundation Pro's bank account statements for September through December 2010, and the parties stipulated Red Dirt's bank account statement for December 2010 and petitioners' joint bank account statements for July, September, November, and December 2010.

**[*16]** Respondent asserts that all the checks deposited into Foundation Pro's bank account are income to Mr. Bolles.

Foundation Pro was Mr. Bolles' nephew's company. His nephew controlled Foundation Pro's bank account, and he deposited all the checks and spent the funds at will. Mr. Bolles had signatory authority on Foundation Pro's bank account for his nephew's convenience, but he did not have a debit card or spend any of the funds in the bank account. The one check payable to Mr. Bolles was deposited in Foundation Pro's bank account and is endorsed as: "Keith Bolles Attributable to Foundation Pro For Deposit Only". The Court is reluctant to view Mr. Bolles' signatory authority over the Foundation Pro bank account as a significant factor in determining whether the checks deposited constitute income to him. On this record Mr. Bolles' nephew also had signatory authority over Foundation Pro's bank account, made all the deposits, and used all the funds at will. Petitioners' increase in wealth was the one check Foundation Pro issued Mr. Bolles for his services, which was deposited into their joint bank account. Therefore, petitioners have rebutted the presumption of income for any deposits in Foundation Pro's bank account.

Respondent is entitled to the presumption of income for the funds deposited into petitioners' joint bank account and Red Dirt's bank account totaling

[*17] $9,234.04.[16]  Mr. Bolles received gross receipts of $9,926.17 that he deposited into the joint bank account and gross receipts of $19,535.87 that he deposited into Red Dirt's bank account for a total of $29,462.04.  Petitioners reported gross receipts of only $20,228 on their 2010 Form 1040.  Petitioners claim that the $9,234.04 difference between the received and deposited gross receipts was due to a family member's paying them $10,000 to purchase the Running Deer acreage after the tornado cleanup.  However, petitioners continue to retain title to the property and have not transferred title to the family member.  Additionally, Mr. Bolles testified that $27,262.04 was payments from masonry work and a referral fee.  The remaining $2,200 came from two cash deposits into Red Dirt's bank account.  Petitioners have not rebutted the presumption that the $2,200 cash deposits are gross receipts.  See DiLeo v. Commissioner, 96 T.C. at 868.  The Court concludes that petitioners had unreported gross receipts of $9,234.04.

B.    Section 162

Section 162(a) allows as a deduction all ordinary and necessary expenses paid or incurred in carrying on any activity that constitutes a trade or business.  To

---

[16]With respect to an additional $800 cash deposit in petitioners' joint bank account, petitioners have rebutted the presumption that the deposit was income because a family member gave them the cash to help them after the tornado.

**[*18]** be "ordinary" the transaction that gives rise to the expense must be of a common or frequent occurrence in the type of business involved. <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940). To be "necessary" an expense must be "appropriate and helpful" to the taxpayer's business. <u>Welch v. Helvering</u>, 290 U.S. at 113. Additionally, for a deduction under section 162, the expenditure must be "directly connected with or pertaining to the taxpayer's trade or business". Sec. 1.162-1(a), Income Tax Regs.

Generally, the taxpayers have the burden to prove their entitlement to any deduction and must maintain adequate records to substantiate their deductions. Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>Welch v. Helvering</u>, 290 U.S. at 115.

Red Dirt's bank account statement for December 2010 contains copies of checks written to individuals with a "labor" notation on the memo line. As to those checks, the Court has found that Mr. Bolles paid nine individuals $6,354.50 in December 2010. Accordingly, the Court holds that petitioners may deduct $6,354.50 of contract labor expenses for Mr. Bolles' masonry business for 2010.

C.    <u>Cost of Goods Sold</u>

Cost of goods sold is an offset to gross receipts in determining business income. Sec. 1.61-3(a), Income Tax Regs. A taxpayer must keep sufficient

[*19] records to substantiate any amount claimed as cost of goods sold. Wright v. Commissioner, T.C. Memo. 1993-27; see also Metra Chem Corp. v. Commissioner, 88 T.C. 654, 661 (1987).

Red Dirt's bank account statement for December 2010 contains copies of checks written to concrete suppliers and other construction supply businesses with "concrete" noted on the memo line of several of the checks. The checks indicate that Red Dirt paid $5,387.80 for concrete, construction supplies, or machinery rental. Additionally, Red Dirt's bank account statement shows that it paid $1,335.33 to brick supply companies and other construction supply businesses. Consistent with those checks, the Court has found that Red Dirt paid $6,723.13 to concrete suppliers, brick companies, and other construction supply businesses. Accordingly as to those items, the Court holds that petitioners may claim $6,723.13 as cost of goods sold for Mr. Bolles' masonry business.

II.    OPC

    A.    Guaranteed Payments

Payments a partner receives from a partnership generally fall into one of three categories. First, a partner may receive payments representing distributions of his or her distributive share of partnership income. See sec. 731. Second, a partner may receive payments in circumstances in which he or she is not treated as

[*20] a partner.  Sec. 707(a).  And third, a partner may receive guaranteed payments for services or use of capital that do not represent distributions of partnership income. Sec. 707(c).  Specifically, section 707(c) provides:

> SEC. 707(c). Guaranteed Payments.--To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).

Whether a partner is acting in his or her capacity as a partner--rather than in his or her capacity as one who is not a member of the partnership--while providing services to his or her partnership is a factual determination.  See Falconer v. Commissioner, 40 T.C. 1011, 1015 (1963); Cahill v. Commissioner, T.C. Memo. 2013-220.

The parties agree that Mr. Bolles received guaranteed payments from OPC, but they disagree on the amount he received.  Respondent relies on the notice of deficiency, which determined that Mr. Bolles received guaranteed payments of $66,521.[17]  Petitioners argue that the amount received includes reimbursement for

---

[17]The parties have now agreed that a $15,000 payment from OPC was to purchase his interest, see supra note 2, and will not be included in the balance of the guaranteed payment discussion.

[*21] expenses paid on behalf of OPC and that Mr. Bolles received guaranteed payments of only $45,121.

The Court has found that Mr. Bolles received 26 checks totaling $51,970.31 for guaranteed payments and expense reimbursements. The Court looks at the OPC checks written to Mr. Bolles to determine the amount of his guaranteed payments.

The record reflects that Mr. Bolles paid some expenses of the partnership and was then reimbursed for those expenses. Mr. Burks credibly testified that Mr. Bolles would often buy lunch for the entire crew when on a job in order to minimize downtime. In Mr. Burks' testimony he also confirmed that Mr. Bolles paid for utilities at the rental properties in Kansas. Because the payments to Mr. Bolles were consistent in amount and timing, the Court can infer that any additional amounts paid to him were for expense reimbursements. Therefore, as the Court has found, Mr. Bolles received $2,150 for expense reimbursements that were not guaranteed payments in 2010.

The record also reflects that OPC paid Mr. Bolles a fixed payment of $250 per week for meals and incidentals as part of his payment for services to the partnership without regard to OPC's income. Therefore, as the Court has found, Mr. Bolles received $4,250 for meals and incidentals that was part of his

**[\*22]** guaranteed payments in 2010 because they are payments to a partner for services without regard to partnership income. See sec. 707(c); Cagle v. Commissioner, 539 F.2d 409, 413 (5th Cir. 1976), aff'g 63 T.C. 86 (1974).

B.     Loan From OPC

Petitioners claim $4,000 was a loan to Mr. Bolles and not a guaranteed payment. Mr. Bolles claims he took out a $4,000 loan with OPC that he never paid back.

Whether a transaction is a loan for Federal income tax purposes is a question of fact. The following factors are considered in determining whether a loan is bona fide: (1) the existence of a sum certain, (2) the likelihood of repayment, (3) a definite date of repayment, and (4) the manner of repayment. Seay v. Commissioner, T.C. Memo. 1992-254; Mangham v. Commissioner, T.C. Memo. 1980-280. For purposes of section 707(a), a loan by a partnership to a partner is considered to have been made only where the partner is under an unconditional obligation to repay a sum certain at a determinable date. See Egolf v. Commissioner, 87 T.C. 34, 47-48 (1986); Cahill v. Commissioner, T.C. Memo. 2013-220.

Mr. Bolles argues that $4,000 paid to him on February 12, 2010, was a loan that he did not pay back when he left OPC. Nothing in the record, including Mr.

[*23] Bolles' own testimony, reflects that he had a definite date of repayment or a manner of repayment. Therefore, the $4,000 was not a loan but rather a guaranteed payment. As the Court has found, Mr. Bolles received total guaranteed payments of $49,820.31.

C.     Car and Truck Expenses

Petitioners claimed a deduction for car and truck expenses of $15,106 on their 2010 tax return. At trial and on brief Mr. Bolles claimed to have incurred those expenses while away from house performing foreman duties for OPC. However, the record, including Mr. Bolles' testimony, reflects that OPC paid the monthly financing payment and fuel for Mr. Bolles' GMC truck while he was performing foreman duties for OPC.

Generally, a partner may not directly deduct the expenses of the partnership on his or her individual returns, even if the expenses were incurred by the partner in furtherance of partnership business. Cropland Chem. Corp. v. Commissioner, 75 T.C. 288, 295 (1980), aff'd without published opinion, 665 F.2d 1050 (7th Cir. 1981). An exception applies, however, when there is an agreement among partners, or a routine practice equal to an agreement, that requires a partner to use his or her own funds to pay a partnership expense. Id.; Klein v. Commissioner, 25 T.C. 1045, 1051-1052 (1956).

[*24] Because Mr. Bolles did not incur the expense of his GMC truck while performing foreman duties for OPC, he is not entitled to deduct the expense. The Court does not have sufficient information in the record to determine whether or how OPC reported the expenses on its books and records or the partners' capital accounts. Therefore, petitioners are not entitled to the deduction for car and truck expenses.

III.     Storm Casualty Loss

Subject to certain limitations, an individual is entitled to a deduction for "any loss[es] sustained during the taxable year and not compensated for by insurance or otherwise" that "arise from fire, storm, * * * or other casualty". Sec. 165(a), (c)(3), (h)(1) and (2).[18]

To properly compute a casualty loss deduction, the following values of the damaged or destroyed property must be established: (1) fair market value before the casualty, (2) fair market value after the casualty, and (3) the taxpayer's basis in the property. See Millsap v. Commissioner, 46 T.C. 751, 759 (1966), aff'd, 387 F.2d 420 (8th Cir. 1968); sec. 1.165-7(a)(2)(i), Income Tax Regs. As a general rule, the precasualty and postcasualty values must be determined "by competent

_____

[18]The Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, sec. 11044, 131 Stat. at 2087-2089, amended sec. 165(h)(5) to limit an individual casualty loss deduction to those attributable to a federally declared disaster.

**[*25]** appraisal." Sec. 1.165-7(a)(2)(i), Income Tax Regs.  As an alternative, the

regulations provide that if the taxpayer has repaired the property damage resulting

from the casualty, the taxpayer may use the cost of repairs to prove the casualty

loss.  See id. subdiv. (ii).  The taxpayer must also show that

> (a) the repairs are necessary to restore the property to its condition
> immediately before the casualty, (b) the amount spent for such repairs
> is not excessive, (c) the repairs do not care for more than the damage
> suffered, and (d) the value of the property after the repairs does not as
> a result of the repairs exceed the value of the property immediately
> before the casualty.

Id.  The cost of repairing the property must be the actual cost incurred to repair the

property, not an estimate.  Lamphere v. Commissioner, 70 T.C. 391, 396 (1978).

Thus, an estimate of the cost of repairing the property cannot be used to determine

the decline in the value of the property.  Id.  The amount of the loss computed

under section 165(a) is limited to the adjusted basis.  Sec. 1.165-7(b)(1), Income

Tax Regs.

The next step in determining the amount of a casualty loss is to reduce the

amount of the loss by the compensation received on account of the loss.  Sec.

165(a); see sec. 1.165-7(b)(3), Examples (1), (2), and (3), Income Tax Regs.  The

reduction is required for section 165(c)(3) casualty losses.  Finally, adjustments

must be made to account for the $100 floor and the 10%-of-adjusted-gross-income

[*26] floor.  Sec. 165(h)(1) and (2)(A).  These adjustments must be made for any section 165(c)(3) casualty losses.

A.    Petitioners' Real Property

To "restore the property to its condition immediately before the casualty" petitioners would need to rebuild a house from raw land (including rebuilding a septic system and foundation), repair the pool, rebuild a pool house, and rebuild the 30 x 40 shed.  After the loss from the tornado damage, petitioners' insurance company compensated them $235,526.50 as the cost of replacing their house and pool and cleaning up debris from the Running Deer property.  The compensation included the cost for a replacement house of $175,000, renovations to the replacement house of $34,385.87, and debris cleanup of $20,571.42.  The compensation did not include the cost of replacing the pool house or the 30 x 40 shed.

Respondent argues that petitioners were overcompensated by their insurance company because the adjusted basis in their house was $108,000--their original mortgage amount.  However, respondent failed to take into account that $108,000 was petitioners' mortgage amount and that amount does not reflect any downpayments or other equity petitioners may have gained in renovating the deteriorated Running Deer property over 10 years.  Petitioners spent significant

**[*27]** labor and resources fixing structural problems, dealing with termites, replacing the roof, pouring new concrete, laying stone work, building an outdoor patio with a custom fireplace, replacing the pool liner, fixing the pool house, and renovating part of the kitchen. Yet, petitioners did not provide the Court with evidence with respect to the cost of doing any renovations to the property. Additionally, the record does not reflect whether the $108,000 mortgage included or excluded the value of their extensive repairs and renovations or if those improvements went toward equity in the property.

Where the taxpayer does not prove a basis, this Court has consistently held that his loss cannot be computed. Millsap v. Commissioner, 46 T.C. at 760; Towers v. Commissioner, 24 T.C. 199, 239 (1955), aff'd, 247 F.2d 233 (2d Cir. 1957). Because petitioners have not proven their adjusted basis in the Running Deer property, they have failed to prove that they incurred a casualty loss for their real property.

B.     Petitioners' Household, Shed, Pool House, and Backyard Property

Petitioners compiled a list of items in their house, their shed, their pool house, and their backyard. Petitioners' insurance company valued those items as of the time of loss at $124,332.76. The insurance company paid them the limit on their personal property coverage--$98,451. Petitioners' list of items did not

[*28] include any clothing, shoes, or accessories for any family member in the household. Neither did it include their dependent sons' toys, electronics, and sports gear.

Respondent argues that petitioners were more than compensated for the loss of their property or that they did not have a sufficient basis to claim a casualty loss. The Court finds respondent's argument unrealistic. Petitioners' insurance company determined petitioners had a total loss to all their property--destroyed under their neighbor's house or swept away in the EF5 tornado. The 32 pages of items listed for the insurance company were for items petitioners had purchased over 15 years of living at the Running Deer property and 25 years of marriage. The insurance company valued the original cost of those items at $180,392.99. Subject to numerous exceptions, the general rule is that a taxpayer's basis in property equals the taxpayer's cost of the property. See secs. 1011 and 1012. Accordingly, the Court finds that petitioners' adjusted basis in their personal property exceeded its fair market value.

The amount of the "loss actually sustained" is, of course, a question of fact. In Cornelius v. Commissioner, 56 T.C. 976, 980-981 (1971), the Court found that the fair market value of the taxpayer's household contents measured by their aggregate cost less a depreciation factor of 20% to 25% was fair and reasonable.

[*29] On the basis of the evidence contained in this record, the Court holds, as reflected in the findings of fact, that the fair market value of petitioners' personal property immediately before the tornado was $135,761.23.[19]

| | |
|---|---:|
| Fair market value of personal property before the tornado | $135,761.23 |
| Fair market value of personal property after the tornado | -0- |
| Amount reimbursed by insurance | 98,451.00 |
| Amount not reimbursed by insurance | 37,310.23 |
| Less $100 (sec. 165(h)(1)) | 100.00 |
| Less 10% of adjusted gross income (sec. 165(h)(2)) | unknown |
| Allowable casualty loss deduction | Rule 155 |

Petitioners also request that the Court include a Chevy z71 off-road pickup truck, an old Jeep, and a horse trailer in their casualty loss calculation. However, petitioners have not provided any values for the Court to determine their fair

---

[19]Petitioners' insurance company valued as of immediately before the casualty their list of items at $124,332.76--a 31% depreciation from original cost value. At trial petitioners submitted as evidence an additional list of household contents, some of which overlapped with the list provided to their insurance company. Petitioners reported that the household contents that were not included on the insurance company's list had a basis of $16,563 ($4,566--dependent sons' clothing, shoes, and accessories; $3,455--Mr. Bolles' clothing, shoes, and accessories; $5,640--Mrs. Bolles' clothing, shoes, and accessories; and $2,902--dependent sons' toys, electronics, and sports gear). The Court will infer 31% depreciation to determine the fair market value immediately before the casualty. See Cornelius v. Commissioner, 56 T.C. 976, 980-981 (1971). The fair market value (adjusted basis minus 31% depreciation) of those items is $11,428.47. ($124,332.76 + $11,428.47 = $135,761.23)

[*30] market values or adjusted bases.  Therefore, those items will not be included in the calculation of petitioners' casualty loss.  Millsap v. Commissioner, 46 T.C. at 760.

IV.    Conclusion

Petitioners had unreported gross receipts on their Schedule C for the masonry business of $9,234.04 for 2010.  Petitioners are entitled to cost of goods sold of $6,723.13 and a deduction for contract labor expenses of $6,354.50.

Mr. Bolles received guaranteed payments of $49,820.31 from OPC in 2010. Petitioners are not entitled to a deduction for car and truck expenses claimed on the Schedule C for OPC.

Petitioners are entitled to a casualty loss of $37,310.23 less $100 and less 10% of their adjusted gross income for 2010.

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.